**James W. FITZGERALD, Appellant,**

v.

**PENTHOUSE INTERNATIONAL, LTD.; Meredith Printing Corporation; Meredith Corporation; Bob Guccione; and Steve Chapple, Appellees.**

**No. 81–2170.**

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1982.

Decided Oct. 13, 1982.

Rehearing Denied Nov. 11, 1982.

William McKamey, Bethesda, Md. (George Seymour Morgan, Bethesda, Md., on brief), for appellant.

Norman Roy Grutman, New York City (Grutman & Schafrann, New York City, William H. Engelman, John Philip Miller, Kaplan, Heyman, Greenberg, Engelman & Belgrad, P. A., Baltimore, Md., on brief), for appellees.

Before BUTZNER, WIDENER and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

This is the second appeal from the district court by the plaintiff, James W. Fitzgerald. The district court's first disposition of this case was a grant of summary judgment in favor of the defendants, Penthouse International, Ltd., Meredith Printing Corp., Meredith Corp., Bob Guccione, and Steve Chapple. We reversed, finding that the publication was capable of defamatory meaning and that there was a genuine question of fact as to the truth of the allegations included in the publication. *Fitzgerald v. Penthouse International, Ltd.,* 639 F.2d 1076 (4th Cir. 1981). Upon remand, the district court again granted summary judgment for the defendants, finding as a matter of law that plaintiff Fitzgerald was a public figure for the purposes of this controversy and that the defendants did not act with malice. 525 F.Supp. 585. We affirm the district court's holding that Fitzgerald was a public figure with respect to the topic of the *Penthouse* article. We hold, however, that there was a substantial question of material fact as to whether any of the defendants acted with actual malice. The judgment of the district court, therefore, is reversed in part.

I.

*Public Figure*

The topic of the article that is the subject of this action was the use of dolphins for military purposes.[1] The plaintiff contends that there was no public controversy concerning the use of trained dolphins by the military and that he did not thrust himself into the public eye with respect to this subject. After a thorough review of the evidence in the light most favorable to the plaintiff, the district court held that a public controversy existed and that the plaintiff was a public figure for the purposes of that controversy. We agree with the holding of the district court.

■ The factors to be considered in determining whether an individual is a public figure for the purposes of a certain issue have evolved in recent decisions of the United States Supreme Court. See Note, *Constitutional Protection of Critical Speech and the Public Figure Doctrine: Retreat by Reaffirmation,* 1980 Wis.L.Rev. 568 (1980). The district court appropriately listed the five requirements for a limited purpose public figure as: (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

■ Even though a person is not a public official or general public figure, an individual may have cast himself into the forefront of a public issue so as to become a limited public figure. *Gertz v. Robert Welch,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009–3010, 41 L.Ed.2d 789 (1974). There was abundant evidence that the public debate over the military applications of trained dolphin technology made this issue a matter of public controversy. *Cf. Wolston v. Reader's Digest Assoc., Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) (plaintiff's failure to appear before grand jury and contempt citation in an espionage

---

**1.** Relevant parts of the *Penthouse* article are reprinted in *Fitzgerald v. Penthouse Interna-* *tional, Ltd.,* 639 F.2d at 1077–78 (4th Cir. 1981).

case did not engage the attention of the public adequately for public controversy finding). In this case, the national press had covered the use of dolphins in Vietnam from 1970 to 1972. In 1973, the television show "60 Minutes" carried a segment on the military use of dolphins, in which the plaintiff was interviewed. In his deposition, the plaintiff virtually acknowledged that there was public interest in the military use of dolphins and that there were different views on the propriety of using dolphins as weapons. The topic has been addressed in books, magazines and newspapers; frequently being accompanied by sensationalized headlines. The use of dolphins by the military is a legitimate topic of public concern and was, in fact, openly discussed by members of the general public. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C.Cir.) *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). The issue goes beyond the mere use of public funds. *See Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). Moral and humanitarian concerns entered the debate over the use of dolphins for military purposes.

The next question is whether the plaintiff is a public figure with respect to the topic of the publication. When considered in the light most favorable to the party against whom summary judgment was granted, the facts of this case establish that the plaintiff was a public figure for a limited purpose. The plaintiff researched the military application of dolphin technology for the United States Navy. He has lectured publicly on the subject and published several articles and reports on dolphin technology. As part of his private business, the plaintiff published brochures which refer to the use of dolphins in anti-submarine warfare. In February 1973, the plaintiff appeared on a segment of the "60 Minutes" television program and discussed the military application of dolphin technology. Although the plaintiff contends that his purpose for appearing on the program was to promote his non-military dolphin technologies, only the portion of his interview that related to military applications was aired.

The plaintiff was also interviewed in March 1976 for an investigative article on the military and covert use of dolphin technology. *See* Kessler, *Navy Uses Dolphins for Spying, Disgruntled Scientist Testifies,* Newsday, Apr. 10, 1976.

The facts reveal that the plaintiff thrust himself into a position of special prominence with respect to the controversy. He sought pecuniary gain through the military and non-military use of dolphin technology and sought to influence the outcome of the controversy through his brochures and public statements. The public controversy existed before and after publication of the alleged defamatory article by *Penthouse* in June 1977. The plaintiff had been interviewed for another article in the previous year, so his public figure status had not grown stale. Furthermore, he had continuous access to the media up to the time of publication of the *Penthouse* article. *See Constitutional Protection of Critical Speech and the Public Figure Doctrine: Retreat by Reaffirmation, supra,* at 590. *Compare Curtis Publishing Co. v. Butts*, 388 U.S. 130, 154–55, 87 S.Ct. 1975, 1991–1992, 18 L.Ed.2d 1094 (1967), with *Hutchinson v. Proxmire*, 443 U.S. 111, 134–36, 99 S.Ct. 2675, 2687–2688, 61 L.Ed.2d 411 (1979). Additionally, the fact that *Parade Magazine* printed an article on the military application of dolphin technology on September 10, 1978, shows that the controversy into which the plaintiff thrust himself was continuing. As an acknowledged expert on this issue, the plaintiff's views still were of value to the media after publication of the *Penthouse* article.

Once the pertinent facts are found or, as here, there is no substantial question of material fact in contention, the issue of whether the plaintiff is a public figure is a question of law for the court. *See Rosenblatt v. Baer*, 383 U.S. 75, 88 n.15, 86 S.Ct. 669, 677 n.15, 15 L.Ed.2d 597 (1966); *cf. Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), and *Wolston v. Reader's Digest Assoc., Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) (in both cases the Supreme Court accepted the

findings of fact of the trial courts but reached different conclusions of law from the lower courts as to whether the plaintiffs were public figures).

We conclude that the plaintiff is a limited-purpose public figure under the guidelines prescribed by the Supreme Court. *See Wolston v. Reader's Digest Assoc., Inc.,* 443 U.S. 157, 166–69, 99 S.Ct. 2701, 2706–2708, 61 L.Ed.2d 450 (1979). In order to recover, therefore, the plaintiff must prove that the defendants acted with actual malice in publishing the *Penthouse* article. *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

## II.

### Actual Malice

The plaintiff does not challenge the portions of the *Penthouse* article that were excerpted from the "60 Minutes" interview or other published articles. After detailing the plaintiff's connection with the Central Intelligence Agency and the past military use of dolphin technology, however, the article continued:

> Fitzgerald continued his own Florida operation. He even made overtures, possibly with CIA and Navy knowledge, to sell dolphin torpedoes or "open-ocean weapons systems" to Mexico, Peru, Colombia, Chile, Argentina, and Brazil. This private merchandising astounded one of Fitzgerald's associates, who observed: "The work in Key West had been top secret, with only a small handful of people in the whole country knowing of its existence, not to mention its purpose." Yet Fitzgerald wanted to make some fast bucks on the side by turning small countries into "instant naval powers." The Pentagon couldn't possibly object for fear of exposing its whole operation.

As we held in *Fitzgerald v. Penthouse International, Ltd.,* 639 F.2d 1076 (4th Cir. 1981), this passage is capable of being read to accuse the plaintiff of espionage. The question now before us is whether there is a substantial issue of material fact that the defendants published this statement with knowledge of its falsity or with reckless disregard of whether it was false. *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–726, 11 L.Ed.2d 686 (1964). For the purposes of this appeal from a summary judgment, all factual inferences must be construed in favor of the plaintiff.

■ The Supreme Court has recognized that the "reckless disregard" necessary to prove actual malice cannot be prescribed by one all-encompassing test. Case-by-case adjudication is the preferred method for determining whether a given factual situation comes within the ambit of actual malice. *St. Amant v. Thompson,* 390 U.S. 727, 730–31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Although actual malice is a very difficult standard for any plaintiff to meet, simple reliance upon someone else's statement does not absolve an author or publisher of liability. "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 732, 88 S.Ct. at 1326. As the Seventh Circuit recently held upon reconsidering *Gertz,* "a publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 538 (7th Cir. 1982). Writing for this circuit, Judge Phillips recently stated: "As long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error." *Ryan v. Brooks,* 634 F.2d 726, 734 (4th Cir. 1980).

■ Conscious of our duty to afford the plaintiff the benefit of all inferences that may be drawn on this summary judgment motion, there is evidence in the record that raises a substantial question of material fact as to whether the defendants had obvious reasons to doubt the veracity of the informant on whom they relied for the allegedly libelous part of the article. Nor

have the defendants adequately rebutted the plaintiff's claim that a more careful investigation of the matter should have been made before publication. It is possible, therefore, that the plaintiff can meet his burden of proving that the defendants had actual doubts about the accuracy of the information they published and that their failure to make an adequate investigation will reveal a reckless disregard for the truth.

The sole source of the information in the article that can be read as an allegation of espionage is a report authored by Michael Greenwood. The report voluntarily had been submitted to the Select Committee on Intelligence of the United States Senate by Greenwood. According to the plaintiff's affidavit, the Greenwood report was dismissed by the Senate Committee as not being pertinent to its work. The Greenwood report included many bold assertions about the United States intelligence community and numerous marine operations. Some of these assertions invite skepticism. For example, he claimed to have knowledge of the reasons for, and mysterious circumstances attendant to, the sinking of the nuclear submarines Thresher and Scorpion. He stated that the cancelled Sealab III mission was to be a rehearsal for the recovery of Soviet missiles in the Sea of Japan. He claimed to have inside information on numerous other clandestine military operations by the United States government. Greenwood also reported that, because of his outspoken criticism of the marine mammal training programs, he was dismissed from government service and "blackballed" from other employment. At the end of Greenwood's report, he noted his disgust with the marine mammal research in the United States and stated his intention to lecture, teach, and conduct research in the Soviet Union.

The plaintiff alleges that other reasons to doubt the veracity of the major source of the article were contained in a letter from Greenwood to the author of the *Penthouse* article, Steve Chapple. The plaintiff contends that Greenwood claimed knowledge of evidence which suggested that the sinking of the Lusitania clearly was set up by Winston Churchill. The letter contained information that a representative of the Humane Society had contacted local chapters to inform them that Greenwood was a "fraud," and that the Humane Society representative personally had reviewed Pentagon documents which convinced him that Greenwood's statements were the fabrication of a sick mind. There are allegations that Greenwood criticized Jacques Cousteau and the Cousteau Society for misrepresenting the truth and for trying to "keep the ocean clean by making the earth dirty." The letter also contains Greenwood's admission that he has violated the National Securities Act and his debriefing from a classified position by speaking out against American marine mammal research. Greenwood also stated that the National Enquirer sought out a story but that it was not published because the owner of the tabloid, whom Greenwood claimed was "apparently a very influential Mafia boss," had a direct working relationship with the Central Intelligence Agency. The plaintiff contends that the report and letter reveal that Greenwood was suffering from a persecutory delusion.

In short, the totality of Greenwood's claims and behavior suggests that *Penthouse* should have done more than it did to authenticate its source for the publication at issue. The plaintiff showed that the pertinent statements made by Greenwood were not researched any further than a simple cross checking among Greenwood, the author, and the research editor. Although some parts of the Greenwood report were corroborated by contacting the persons whom they concerned, the allegations about the plaintiff were substantiated only by Michael Greenwood. The plaintiff has presented evidence that research editor Susan Bidel trusted the reliability of author Steve Chapple with respect to the veracity of the libelous statements. Chapple, in turn, relied solely upon Greenwood's report and personal assurances of the accuracy of the statements. The plaintiff also has introduced evidence that Greenwood invited

Chapple to contact the plaintiff to verify his accounts. All parties agree that the plaintiff was not contacted by *Penthouse*. There is no evidence anyone contacted about other statements in the *Penthouse* article corroborated the libelous statements regarding the plaintiff.

We cannot hold as a matter of law that the plaintiff has not produced a sufficient factual basis to prove actual malice. The plaintiff has presented a factual question as to the reliability of Greenwood and the defendants' "obvious reason to doubt" the veracity of their informant. The entry of summary judgment for the defendants, therefore, is reversed.

### III.

Having reversed the district court's summary judgment with respect to the plaintiff's cause of action for defamation, we also reverse the grant of summary judgment on three of the other causes of action brought by the plaintiff. The district court's rulings on the counts of invasion of privacy in a false light, interference with business relationships, and conspiracy were all predicated upon the same constitutional standard as the defamation claim. Upon remand, the district court should reconsider these claims if relief based on plaintiff's cause of action for defamation is denied. In ruling upon the trespass cause of action, the district court simply stated that it knew of no authority recognizing such a claim in Maryland. Because this point was not addressed by the plaintiff on appeal, we affirm the district court's grant of summary judgment on the trespass claim.

### IV.

■ The final issue on appeal is the district court's denial of a motion of recusal by the plaintiff under 28 U.S.C. § 144 (1968). The plaintiff's allegations of prejudice and bias by the district judge solely involved the court's rulings upon legal issues before it. The bias or prejudice that would require a judge to recuse himself must come from an extrajudicial source and affect the judge's opinion on the merits.

*United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). There is no evidence in this case that the trial judge's decisions were affected by anything other than the evidence presented by the parties. No example of personal prejudice or bias on behalf of the judge has been alleged by the plaintiff. The district court, therefore, properly denied the motion for recusal.

### V.

For the foregoing reasons, we affirm the district court's holding that the plaintiff is a public figure for a limited purpose, the grant of summary judgment on the trespass cause of action, and the denial of the plaintiff's recusal motion. We reverse the summary judgment on all other causes of action, because there is a substantial question of material fact as to whether the defendants acted with actual malice. This case is remanded to the district court for trial on the actual malice issue.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.