Richard Lloyd CARR, Plaintiff,

v.

FORBES, INC., Matthew Schifrin, and
John Does I–X, Defendants.

No. 6:99–1967–13.

United States District Court,
D. South Carolina,
Greenville Division.

Nov. 9, 2000.

William Marvin Grant, Jr., Langdon Cheves, III, Grant and Leatherwood, Greenville, Lloyd Richard Carr, [Pro se], Phoenix, AZ, for Lloyd Richard Carr, plaintiffs.

Wallace K. Lightsey, Wyche Burgess Freeman and Parham PA, Greenville, for Forbes Incorporated, Matthew Schifrin, John Does, defendants.

## *ORDER*

**Granting Defendants' Motion for Summary Judgment AND Denying Plaintiff's Motion to Seal Order Pending Appeal**

GEORGE ROSS ANDERSON, Jr., District Judge.

## *INTRODUCTION*

This matter came before this Court for hearing on Thursday, September 28, 2000,

on Defendants' Motion for Summary Judgment and on Plaintiff's Motion for Partial Summary Judgment. Defendants were represented at the hearing by Wallace K. Lightsey and Carl F. Muller of the law firm Wyche, Burgess, Freeman & Parham, P.A., and by Tennyson Schad, of the law firm Norwick & Schad. Plaintiff was represented at the hearing by William M. Grant, Jr., and Langdon Cheves of the law firm Grant & Leatherwood, P.A.

After carefully reviewing and considering the pleadings, memoranda, affidavits, exhibits, and depositions on file with the Court, and after hearing arguments of counsel, I have decided to deny Plaintiff's Motion for Partial Summary Judgment and grant Defendants' Motion for Summary Judgment, because I have concluded that Plaintiff is a public figure as a matter of law. Based on this legal determination, the burden of proving actual malice is on Plaintiff. To avoid summary judgment, Plaintiff must demonstrate that he can present evidence at trial that would support a jury finding that there is clear and convincing proof of actual malice. Plaintiff has failed to come forward with any evidence of actual malice, much less sufficient evidence to overcome his burden. Accordingly, summary judgment is appropriate in favor of Defendants on the public figure issue.[1]

Subsequent to my decision to grant Defendants' Motion for Summary Judgment, Plaintiff filed a Motion to Seal Order Pending Appeal. However, Plaintiff has failed to meet his burden of establishing any legitimate basis for which to seal this Court's order from all public view, especially in light of the fact that all other pleadings and evidence in this case are available to the public. Therefore, I deny the Plaintiff's Motion to Seal Order Pending Appeal.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

There is no genuine dispute as to the facts material to the determination of this issue. Plaintiff, Richard Carr, is a citizen and resident of the state of Arizona, where he has lived for the past 23 years. An engineer by education, Carr founded Interwest Management, Inc., ("Interwest") in 1991 to promote construction projects for various governmental and quasi-governmental entities utilizing public-private partnerships to obtain financing for and to undertake construction of the projects. In exchange for undertaking the management of a particular project and putting the deal together, Carr or his employer would receive a fee. Most if not all of these projects have involved the actual or proposed construction of public works for public authorities.

Just prior to establishing Interwest, Carr was involved with a company called Westrends. Carr sought to persuade the small town of Quartzsite, located in southwest Arizona, to contract with Westrends to develop a prison project. Carr met frequently with public officials, public employees, and members of the public to attempt to persuade the town to hire his company to carry out all aspects of the project, including the financing. There was considerable local opposition to the

1. The Court's ruling granting summary judgment in favor of Defendants is based on a determination that Plaintiff is a public figure and cannot meet his burden of proving actual malice. Therefore, there is no reason to reach the other issues presented by Defendants in their Motions for Summary Judgment. Accordingly, this order does not reflect in any way on the merits of any of Defendants' other grounds upon which summary judgment was sought, such as whether or not statements in the article were statements of opinion or rhetorical hyperbole that are not actionable; whether or not the factual statements of and concerning Plaintiff contained in the article were substantially true; whether or not Plaintiff's claims should be dismissed because they were filed after the statute of limitations had run; or whether or not Plaintiff's cause of action for civil conspiracy should be dismissed for failure to allege or present evidence of a viable claim for conspiracy.

prison project, and Carr eventually stopped promoting it.

In 1991, Carr organized another company, Interwest Management, Inc., which was wholly owned by Carr's former employer, an engineering firm known as the DLR Group. Carr was the president and CEO of Interwest and exercised supervision and control over its business affairs. There were no other corporate officers and few employees during Carr's tenure with Interwest. The company never generated enough revenue to pay for its expenses and remained heavily in debt to DLR during most of its existence.

After organizing Interwest, Carr returned to Quartzsite to promote the idea of hiring Interwest to develop a sewer system for the town. As he had done with the prison project, Carr spoke at numerous public meetings to promote the sewer project. Although Interwest obtained a contract for the development of the sewer system, the Mayor of Quartzsite terminated the contract after deciding that it created too great a financial burden for the town. Throughout that process, the proposal "aroused considerable public controversy [and Carr] was the leader and spokesman for the sewer project, the same as for the prison project."[2] The local newspaper published numerous articles about the projects, many of which featured Carr. In fact, the editor of the newspaper states in his affidavit:

> Carr took the lead role for his companies on these projects, serving as their face to the media and the public. Both projects involved requests by Mr. Carr for the expenditure of public funds and for the undertaking of binding contracts by public bodies. Both stirred considerable public controversy and political debate.... At times Mr. Carr would contact me or my staff and seek to influence

coverage by *The Gem* of his proposals. Mr. Carr was unquestionably a public figure.[3]

In addition to the many and varied news articles concerning Carr and the sewer project in Quartzsite, Carr actively sought out public attention by writing to the newspaper and publishing "guest editorials" to garner support for and counter opposition to the sewer project. When the contract was terminated, Interwest sued the town and the financial advisor that had been involved with the deal. The litigation led to an arbitration and multiple trials and appeals, and now years later the case is still pending in the Arizona courts.

In the meantime, the former Town Attorney of Quartzsite went to work in another small city, Apache Junction, located on the outskirts of Phoenix. He and the Apache Junction Chamber of Commerce invited Carr to talk about the construction of a sewer system for Apache Junction, and Carr promoted the idea to city officials. The citizens of Apache Junction had voted down two previous attempts to build a sewer system using tax dollars, but Carr persuaded the City Council that the project could be financed by having a non-profit association issue tax-exempt bonds. In doing so, "Carr ... frequently appeared in public and at official meetings to represent Interwest and speak about the project."[4]

Interwest obtained a contract to develop the sewer system for Apache Junction. A non-profit sewer district was organized to issue approximately $32 million of bonds, which were underwritten by the investment banking firm of Mesirow Financial, Inc., and purchased by Allstate Insurance Company. The system was constructed and went into operation in late 1995. Interwest received a fee of about $1.4 million from the deal.

**2.** Affidavit of Rex B. Byrd ¶ 3.

**3.** Affidavit of Jim Loyd ¶¶ 2, 4, 5; *see also* newspaper articles attached to Mr. Loyd's affidavit.

**4.** Affidavit of Det. Sgt. Troy Mullender ¶ 2; *accord* Affidavit of Tony Vehon ¶ 6; Affidavit of Edward Grabek ¶ 13; Affidavit of Kathleen Connelly and attachments thereto.

Approximately one year later, the sewer district was bankrupt, the bonds were in default, and there was evidence that Interwest had fraudulently inflated the projected revenues of the system in order to help sell the bonds. The manager of the system describes in his affidavit:

When the District mailed the first set of bills to the list of customers supplied to it by Interwest, only half of the bills resulted in payments. Many of the bills were returned to the District by the United States Postal Service marked "Undeliverable." When we sent the next set of bills, the same thing happened. We quickly investigated the matter and discovered that *many of the addresses ... did not exist and were assigned to vacant land* .... I [also] found that Interwest had included numerous customers in their 1995 financial projection even though the already completed design of the sewer system (1994) showed that the area would not be sewered. In another case I found that Interwest projected approximately 790 multi-family customers paying for services at start-up of the District *when the two parcels of property were actually vacant land* with no serious plans underway for multi-family development. Interwest even included the non-existent multi-family housing units as paying customers in their financial disclosure reports to the bondholder many months after operations began.[5]

The sewer district filed suit against Interwest alleging fraud, and Allstate followed suit shortly thereafter, alleging securities fraud, common law fraud, and related causes of action. Allstate's lawsuit recently settled "for a considerable sum of money"[6]—reported to be over $9,300,000.[7] Of the approximately $1.4 million received by Interwest and its parent company DLR Group, Inc., on the Apache Junction sewer project, Interwest and DLR Group reportedly paid $1.25 million as part of the settlement.[8] In the meantime, the local police and the Phoenix bureau of the FBI investigated allegations of fraud, forgery, and bribery involving Carr and Interwest, although ultimately no one was prosecuted. The financial problems of the sewer district, the bond default, the lawsuits, and the criminal investigations "generated enormous publicity in the Apache Junction and Phoenix area concerning the project, Mr. Carr and Interwest."[9]

Around the same time it was setting up the Apache Junction deal, Interwest was also putting together a team to submit a proposal to construct the Southern Connector, in Greenville County, South Carolina, with financing from tax-exempt bonds issued by a non-profit association. In January 1996, the South Carolina Department of Transportation received three competing proposals for the project—one from the Interwest group, one from Fluor Daniel, and one from Perini, Harbert–Yeargin (a joint venture between the Perini Corporation and Harbert–Yeargin, a Greenville engineering firm). On February 29, 1996, the DOT decided to go forward with contract negotiations with Interwest.

Shortly thereafter, Jack Rizzo, Vice President of the Perini Corporation, sent a formal letter of protest to the South Carolina Department of Transportation, protesting the DOT's decision. In particular, Mr. Rizzo voiced a strong complaint about the fact that Interwest had used the firm of Wilbur Smith Associates to prepare a *new* traffic and feasibility study as the basis of Interwest's financial model for the

---

5. Affidavit of Edward Grabek ¶¶ 4, 9 (emphasis added).

6. Affidavit of Edward Grabek ¶ 12.

7. "Sewer Proponents Out $9 Million in Suits," *The Arizona Republic* (Sept. 2, 2000).

8. *Id.*

9. Affidavit of Tony Vehon ¶ 7.

project. Wilbur Smith had prepared a similar study in 1994 as part of the DOT's preliminary evaluation of the project. The 1994 study had been provided by the DOT to all three companies submitting proposals on the project. However, after joining Interwest's team, Wilbur Smith prepared a new traffic study in 1995 that increased the toll revenue schedule by 50% over the original study prepared just one year earlier. As Mr. Rizzo stated in his letter of protest:

> The basis of our revenue projections, as stated in our proposal, was the October 1994 "Preliminary Feasibility Study for the Greenville Southern Connector" prepared by Wilbur Smith Associates for Florence & Hutcheson, Inc., and provided by SCDOT. . . .

> A more serious concern in this area is the increased toll revenue schedule proposed by Interwest Carolina, for whom Wilbur Smith Associates served as traffic engineer. What has happened in the area since 1994 to warrant a 50% increase in the recommended tolls for the project? Was the first study which was provided to all proposers not prepared carefully? Has Wilbur Smith Associates prepared a study to support the project costs? This issue also highlights the difficulties involved when consultants which have been so closely involved with the preparation and analysis of the preliminary materials, provided to all proposers as a common reference, are also allowed to participate in the preparation of final proposals. Many municipalities and agencies have chosen to restrict later involvement of these parties.[10]

The South Carolina DOT nevertheless proceeded to negotiate with Interwest over the details of the project. Carr was the primary representative for the Interwest group in the communications and negotiations with South Carolina DOT officials. Those negotiations were still underway in

10. Letter of March 11, 1996, from John R. Rizzo to Betty Mabry and Larry C. Duke

January 1997 when Allstate sued Interwest in Arizona alleging fraud in the Apache Junction deal. That lawsuit received extensive publicity in Arizona and in South Carolina, and Carr figured prominently in the news reports. On April 9, 1997, a weekly newspaper published in Phoenix, the *New Times,* published a lengthy, detailed report about Carr, the allegations over the Apache Junction project, and other questions about Carr's past. This article, entitled "Carr Wrecks," reported among other things that:

- "Richard Carr, president of a firm that wants to build the $350 million South Mountain Toll Road [in Arizona], has extensive experience in 'public-private partnerships.' Unfortunately, most of those experiences have been bad."

- "Carr has shown a knack for recognizing needs, ginning up demand and selling himself as the path to progress— often in obscure, politically unsophisticated burgs. He sold Apache Junction a sewer system. He tried to sell Quartzsite a sewer and a prison, but Quartzsite only bought the sewer. The City of Douglas was poised to let Carr build a private prison, but city fathers got spooked and backed away."

- "The [Arizona] toll-road project isn't the first 'public-private partnership' Carr has attempted, and his track record to date has been anything but sterling. In fact, nearly everywhere he treads, Richard Carr seems to leave a wake of litigation, political intrigue, bankruptcy and dubious characters."

- "A year after Apache Junction's $32 million sewer system became functional, the special district that Carr organized to build it has declared bankruptcy. Claims of fraud, forgery and lawsuits are flowing like, well, wastewater. And the FBI is poking around."

(Exhibit A–7 to Affidavit of George W. Price).

- "Carr convinced the town of Quartzsite to build a sewer system. The project helped polarize the community and spawn a thicket of lawsuits."

- "[I]f Carr can reel in just one toll-road project, he stands to make a lot of money, regardless of that road's viability. Carr would get a good chunk of his money up-front, simply for putting the deal together.... 'That's where the scam can come in,' warns C. Richard Lehmann, who tracks bond defaults for the Bond Investors Association, a nonprofit industry watchdog group based in Miami, Florida. Lehmann says Carr's method—creating a special district to issue bonds—has proved a recipe for disaster in the past. 'You set these things up, and no one's left minding the store,' Lehmann says. 'And since there's no equity the bondholders take the loss.'"

It is undisputed that Carr never sued the author or publisher of the "Carr Wrecks" article. Not long after "Carr Wrecks" was published, Phoenix's daily newspaper, *The Arizona Republic*, reported that Carr was being removed from a toll road project that Interwest was pursuing with the Arizona Department of Transportation.[11] Carr had been acting as the "primary contact person for Interwest in its dealing with the ADOT," including the representation of Interwest at public meetings on that project.[12] On May 21, 1997, Interwest sent a letter to the Arizona DOT stating that Carr had been replaced by Robert Farris as president, that Interwest's Phoenix office was being closed, and that Carr would no longer be involved in the Arizona toll road project.

The "Carr Wrecks" article quoted Richard Lehmann, a national expert on bond scams and defaults, to the effect that financing like that used in the Apache Junction project has great potential for abuse, in that the promoters take big fees for themselves but then the projects cannot generate sufficient revenue to carry the debt service on the bonds. When Lehmann learned that Carr was pursuing a similar deal on the Southern Connector, he contacted *Forbes* reporter Matt Schifrin, whom he considered a very good reporter from previous articles that Schifrin had done on the subject of tax-free bonds, to suggest that Schifrin look into doing an article on this project.

After a preliminary investigation, Schifrin decided to go ahead with the article. He spent several weeks researching and writing the article, eventually entitled "Moonshine Bonds," which is the subject of this lawsuit. He first obtained relevant background information and documentation, and then he began calling people for interviews. He interviewed Carr twice, once at great length. He also spoke with other members of the Interwest group involved in the Southern Connector project, including one of the underwriters and a financial advisor working with Interwest on the project. He interviewed city officials in Apache Junction and the attorney for Allstate, and he obtained and reviewed documentation about the Apache Junction bond offering, the default on those bonds, and the resulting bankruptcy and fraud lawsuits that were filed in Arizona, including the bond offering memorandum, the bankruptcy filing by the sewer district, and the Allstate complaint.

Schifrin also got in touch with George Price, a local resident opposed to the Southern Connector, who sent Schifrin a detailed memorandum on the background of the Southern Connector. Along with the memorandum, Price sent Schifrin a thick binder containing extensive documentation, including the two feasibility studies prepared by Wilbur Smith Associates; Interwest's proposal for constructing the Southern Connector; the South Carolina DOT's evaluation of the three com-

---

**11.** "Toll Road Point Man Off Project," *The Arizona Republic* B1 (June 4, 1997).

**12.** Affidavit of William J. Hayden ¶¶ 5, 6.

peting proposals; the letter of protest from Perini, Harbert–Yeargin; internal Interwest documents; newspaper reports of Carr's troubles in Arizona; and a number of news reports and other documents concerning the Southern Connector.

After Mr. Schifrin finished writing the article, it was independently reviewed and checked for factual accuracy by Forbes employee Steve Johnson. Mr. Johnson spoke twice with Mr. Carr, who confirmed many of the facts reported in the article. Johnson also interviewed other sources, reviewed documents given to him by Matt Schifrin, and obtained additional documents concerning Interwest's proposal on the Southern Connector project.

On June 18, 1997, *Forbes* published "Moonshine Bonds." Most of the article concerns Carr's background in Arizona and in particular the substantial problems and serious allegations that had arisen from the Apache Junction sewer project. Five of the article's twenty paragraphs deal with the Southern Connector. As stated by the article's author, his intent was to raise questions as to whether the bonds that were to be issued to finance the Southern Connector were a sound investment, in light of the woeful record of financial results of prior projects, Carr's checkered history, and the fact that allegations similar to those from Apache Junction had arisen in connection with the Southern Connector.

However, by June 1997, *before* the publication of the *Forbes* article, Carr had already been the subject of wide publicity on the issue of public-private partnerships in a variety of publications throughout Arizona and other parts of the country. At the motion hearing, Plaintiff's counsel represented to the Court that these articles were published after the *Forbes* article. The Court's review of the record, however, demonstrates that this representation is simply untrue. In the evidence provided in support of Defendants' Motion for Summary Judgment alone, *there are over 400 specific references to the Plaintiff in literally dozens of articles, **all published before the Forbes article**, in at least ten different publications in Arizona, South Carolina, and Washington.*

Plaintiff also argues that the news stories were simply his responses to unwanted attention. Again, the evidence before the Court belies this claim. The record demonstrates that Carr had repeatedly and aggressively sought public attention, not only through the media, but also through appearances before public meetings and in meetings and negotiations with governmental bodies and officials. Public works projects are Carr's stock and trade, and politics and public debate are centrally entwined with the services that he and Interwest promoted. Many of the projects in which Carr has been involved over the last two decades have been funded at least in part by public money, and all have required some form of public or governmental approval. Carr has time and again voluntarily appeared at public meetings to promote his companies for public projects, and he has written numerous editorials and otherwise used the press extensively to promote his agenda.

With regard to this concept of joint public-private development and management of public infrastructure projects, Carr has "cast himself into the forefront of a public issue so as to become a limited public figure," *Fitzgerald v. Penthouse International, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982). Carr describes himself in the Interwest Carolina proposal for the Southern Connector as having been "instrumental in the development of several public-private partnerships, most notably the Central Arizona Water Treatment Plant." [13] *The Arizona Republic* called Carr "the lead player" in a proposed public-private toll road in Phoenix, Arizona.[14] The managing

---

**13.** Interwest Carolina Response to Request for Proposals for the Southern Connector, p.

14 (Exhibit A–6 to Affidavit of George W. Price).

**14.** "Toll Road Point Man Off Project," *The*

principal of Interwest's parent company has described Carr as "the leader" in the development of the public-private partnership concept marketed by Interwest and has stated that Carr was the most publicly prominent figure involved in the Southern Connector project.[15] Furthermore, his role in this regard involved extensive interaction with government and elected officials in the promotion and development of such projects.

Understandably, the public-private development and management concept has attracted extensive media coverage nationwide. Well before the Southern Connector project, "public-private partnerships" promoted by Carr and his companies had created a public controversy not only as to individual projects but also regarding the wisdom and propriety of placing public works (and often public money) in private hands. As both the "project leader" or "principal manager" on many of these proposed projects and a leading promoter of the public-private partnership concept in general, Carr assumed a prominent place in this controversy, and was the subject of significant media attention. Often this attention was invited and even solicited by Carr himself.

■ With regard to the *Forbes* article, Carr satisfies all five elements of the Fourth Circuit's test for limited purpose public figure status. *See Fitzgerald*, 691 F.2d at 668. First, there is and has been a public controversy surrounding public-private development in general as well as the specific public works projects discussed in "Moonshine Bonds." *See id.* at 668–69. Dozens of newspaper and magazine articles, many of which focus on Carr and projects in which Carr has played a leading role, evidence this fact.

*Arizona Republic*, June 4, 1997.

15. Deposition of James P. Roubal at 31, 44.

16. "Earlier Project's Woes Move Connector's Foes to Demand State Probe of Developer," *The Greenville News*, February 7, 1997.

Second, Carr has had ample "access to channels of effective communication" with regard to this controversy. *Id.* at 669. Carr has written numerous editorials and letters to the editor promoting his public-private projects. As noted above, he has solicited the press to influence its coverage of such projects; he has been extensively covered by the media; and he has participated in numerous public meetings and addressed and advised elected and appointed officials in conjunction with his role in those projects. And with regard to the Southern Connector project in particular, his group paid a lobbyist/public relations firm over $1 million to promote the project to the local community.

Third, in promoting these public-private projects (including the Southern Connector), Carr has "assumed a role of special prominence" in the controversy that surrounds them, frequently acting as the "leader" of and prominent spokesman for these projects. *Id.* He and his employers admit as much, especially with regard to the Southern Connector.

Fourth, it goes without saying that Carr has "sought to influence the resolution or outcome of the controversy" surrounding his public-private projects. *Id.* Carr's whole purpose for participating in the public debate surrounding his public-private projects has been to make those projects a reality by obtaining public approval for them.

Finally, there is no question that Carr was a public figure at the time "Moonshine Bonds" was published. Early in 1997, *The Greenville News* reported that problems with another of Carr's public-private projects had prompted the South Carolina Attorney General to investigate Interwest,[16] and that multiple fraud suits regarding that project had been filed.[17]

17. "Southern Connector Firm Faces A Second Fraud Suit in Arizona," *The Greenville News*, Feb. 15, 1997.

Carr figured prominently in these articles. And the month before "Moonshine Bonds" was published, *The Arizona Republic* reported that Carr had been removed from the public-private toll road project that Interwest was pursuing in Phoenix.[18] Further, at the time "Moonshine Bonds" was published, Carr's public-private projects were the subject of multiple criminal investigations, civil suits, and bankruptcies.

Courts have consistently deemed individuals in circumstances similar to Carr's to be public figures when the subject of the alleged defamatory statement related to their involvement with controversial government programs. In *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703 (4th Cir.1991), the Fourth Circuit sitting *en banc* held that a scientist conducting research for a federal agency under contract was a limited purpose public figure with regard to an article in a research journal criticizing his work. The *Reuber* Court noted that, like Carr, the scientist was "no stranger to the ... political debates" related to the article, *Reuber*, 925 F.2d at 706, that media coverage and testimony before government agencies afforded him "channels of communication," *id.* at708, and that he had "described himself as 'eminent' in his field." *Id.* at 709. The *Reuber* Court recognized that a plaintiff like the scientist in that case might not desire to be a public figure, but noted that "even 'involuntary' participants can be public figures when they choose a course of conduct that invites public attention." *Id.* at 709.

Even more closely on point to the facts of this case, the Third Circuit has held that an architect "who has participated in numerous public building projects" was a public figure with regard to alleged defamatory statements about his work on those projects. *McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir.1985). As in this case, the *McDowell* Court found that public money, a public works project, and possible conflicts of interest on the part of the plaintiff with regard to those projects were sufficient to create a "public controversy." *Id.* at 948. Further, the *McDowell* Court found that, like Carr, the architect in that case "was the subject of significant public notoriety and scrutiny well before" the alleged defamation. *Id.* at 949. Accordingly, it found that the architect was significantly involved in the public controversy in question and was thus a public figure.[19] *Id.* at 950.

Other courts have followed the general reasoning of *Reuber* and *McDowell* in finding plaintiffs similar to Carr to be public figures by virtue of their prominent involvement in public affairs, no matter how local the context. In *Nicholson v. Promotors on Listings*, 159 F.R.D. 343 (D.Mass.1994), the District Court for the District of Massachusetts found the manager of a municipal auditorium to be a public figure with regard to a publication accusing him of fiscal mismanagement. In doing so it noted:

> Local governance, no less than national governance ... is the concern of all in an open and democratic society. At an abstract level, the management and operation of a municipal auditorium implicate concerns relating to the efficacy of local governance and the integrity of the public fisc. Thus, alleged mismanagement and fiscal impropriety in such an

---

**18.** "Toll Road Point Man Off Project," *The Arizona Republic*, June 4, 1997.

**19.** The *McDowell* Court noted that the architect's role in public works projects was sufficient to render him a public figure with regard to those projects even if he had no desire to receive public attention or scrutiny. The Court stated, " 'Where a person has, however, chosen to engage in a profession which draws him regularly into regional and national view,

and leads him to "fame and notoriety in the community," even if he has no ideological thesis to promulgate, he invites general public discussion.' " *McDowell*, 769 F.2d at 950 (quoting *Chuy v. Philadelphia Eagles*, 431 F.Supp. 254, 267 (E.D.Pa.1977)). In this case it appears that Carr has had an ideological agenda—the public-private concept—that is worthy of public discussion.

area are inevitably of concern to the public.

*Id.* at 352. Here, it is self evident that the very public-private concept for public works that was promoted by Carr implicated "concerns relating to the efficacy of local governance and the integrity of the public fisc." *Id.* Thus, in assuming a prominent role in various public-private public works projects, Carr became a public figure with regard to them.

In short, the record before the Court demonstrates overwhelmingly that, as a matter of law, Carr was a public figure in relation to the controversy that was the subject of "Moonshine Bonds." Having found Plaintiff to be a public figure in relation to the controversy at issue, the Court must next determine whether Plaintiff has shown that he can establish at trial, with proof sufficient to support a jury finding of clear and convincing evidence, that Defendants acted with actual malice. The Court finds that Plaintiff has failed to meet this burden.

 In order to sustain his burden of proof on the issue of actual malice, Plaintiff must

demonstrate with clear and convincing evidence that the defendant[s] *realized* that [the article] was false or that [they] *subjectively* entertained serious doubt as to the truth of [the article].

*Bose Corporation v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984) (emphasis added; citations omitted).

[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (emphasis added). "Failure to investigate does not in itself establish bad faith." *Id.* at 733.

These rigorous standards were recently reaffirmed by the South Carolina Supreme Court:

Actual malice is a subjective standard testing the publisher's good faith belief in the truth of his or her statements. The constitutional actual malice standard requires a public official [or public figure] to prove by clear and convincing evidence that the defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for its truth. A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth* of his publication." There must be evidence the defendant had a *"high degree of awareness of . . . probable falsity."*

*Elder v. The Gaffney Ledger,* Op. No. 25153, Shearouse Adv. Sh. No. 24, at 9 (S.C. June 19, 2000) (emphasis in original) (quoting *St. Amant; Garrison v. State of Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)).

The author and fact-checker of the article have stated in their affidavits and depositions that they were very confident of the truth of the statements in the article at the time it was published. The sources used for the article were considered knowledgeable and reliable, and what they said was backed up with public documents. Carr himself confirmed to Schifrin and Johnson many of the facts reported in the article. Neither Schifrin nor Johnson had any prior knowledge of Carr or Interwest, and George Price noted in his affidavit that, when he spoke with Schifrin, "the impression I got from him was that he was only interested in the question of whether the bonds were a viable way to do the financ-

ing of the project. He did not appear to be 'after' Mr. Carr or anyone else, but just was concerned with whether these were 'junk bonds.' " [20]

Thus, Defendants have done more than simply make a conclusory denial of malice. They have presented a specific and detailed showing of the thoroughness of their investigation and the grounds for their good faith belief in the truthfulness of the allegedly defamatory statements in the article. By contrast, Plaintiff, who bears the burden, has failed to come forward with evidence that would justify a jury concluding that there is clear and convincing evidence of actual malice. Carr's argument on this issue consists of three parts, each of which is addressed below: (1) his charge that Schifrin relied on biased sources; (2) his complaint that Schifrin did not interview all those persons whom Carr thinks he should have interviewed; and (3) the opinion of Carr's "journalism experts" that *Forbes* departed from "applicable standards of journalism" in that the article was not "balanced and fair."

█ First, the record demonstrates that Schifrin did not rely on the uncorroborated statement of either of the sources whom Carr considers biased; instead, the article was based, in part, on information in documents provided by those sources. Carr does not dispute the authenticity of those documents, and he does not point to a single allegedly defamatory statement in the article that came solely from the mouth of a "biased" source. Further, the record is replete with evidence that Schifrin conducted an extensive investigation in addition to talking with the sources who provided information that Carr does not like. Schifrin interviewed Carr and other members of Carr's team, and he reviewed and analyzed numerous documents. Thus, this case is simply not a situation of an article being printed "on the basis of an admittedly unreliable source, without further investigation," as Plaintiff argues.

Second, it is black-letter law that failure to investigate further does not constitute malice. *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323. The law does not require *Forbes* to track down every possible source or to interview every person whom Plaintiff believes should have been interviewed. *Levan v. Capital Cities/ABC, Inc.,* 190 F.3d 1230, 1243 (11th Cir.1999). In this case, the record is clear that Schifrin interviewed people on both sides of the story. The record is equally clear, indeed compelling, that Schifrin had a good faith basis for the conclusions he expressed in his article. Carr cannot prove actual malice simply by asserting that Schifrin should have talked to additional people on Carr's side.

That *Forbes* chose to discount Carr's explanations and excuses is not evidence that it in fact had doubts as to the truthfulness of the article. Denials by public figures to media charges are part and parcel of free discussion about public affairs. The mere fact that a defamation defendant knows that the public figure has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations. As the United States Supreme Court has noted, " 'such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.' " *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 692 n. 37, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quoting *Edwards v. National Audubon Soc'y,* 556 F.2d 113, 121 (2d Cir. 1977)).

Finally, as to the opinions of the "journalism experts," the Fourth Circuit has held that it is ***reversible error*** to instruct the jury that actual malice may be established merely "by showing a departure from accepted journalistic practices." *Reuber,* 925 F.2d at 711. The sole authority on which Plaintiff relies for his conten-

---

20. Affidavit of George Price, ¶ 3.

tion that the "expert" opinions are evidence of malice, *Elder v. Gaffney Ledger*, 333 S.C. 651, 511 S.E.2d 383 (Ct.App.1999), was reversed by the South Carolina Supreme Court. *Elder v. The Gaffney Ledger*, Op. No. 25153, Shearouse Adv. Sh. No. 24 (S.C. June 19, 2000).

Moreover, the "balance and fairness" standard advocated by Plaintiff's experts are not the applicable legal standard. The First Amendment protects a publisher's right to decide what facts it will report on a particular matter and what facts it chooses not to report. Unless Plaintiff can prove, with clear and convincing evidence, that someone at Forbes knew a defamatory statement in the article was false, or had actual awareness of probable falsity, liability cannot be predicated on the contention that the article is not "balanced and fair." *See, e.g., Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir.1986); *Levan*, 190 F.3d at 1243; *Brown v. Herald Co.*, 698 F.2d 949, 951 (8th Cir.1983); *see also Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (striking down a law requiring newspapers to give political candidates a right to reply to negative editorials).

In short, Plaintiff has come forward with no evidence that anyone at Forbes knew of any false statement in the article or in fact entertained serious doubts as to the truthfulness of the article. As a matter of law, therefore, Plaintiff Carr has not met his burden of demonstrating that he can prove actual malice to the jury with clear and convincing evidence.

Consequently, Defendants are entitled to summary judgment, and this Court grants Defendants' Motion for Summary Judgment.

## II. *PLAINTIFF'S MOTION TO SEAL ORDER PENDING APPEAL*

■ Plaintiff filed a motion to place under seal the Court's Order herein contained granting Defendants' Motion for Summary Judgment pending the appeal of that Order. Plaintiff's grounds for the motion are: (1) there is no violation of any First Amendment right in that the Order is under seal only pending appeal; (2) Defendants can demonstrate no damage or injury if the Order is placed under seal; and (3) failure to place the Order under seal pending appeal will result in hardship and irreparable harm to Plaintiff if the Order is eventually reversed.

It is significant that the Plaintiff made no request to seal any other pleadings or evidence presented in this litigation, even though the Plaintiff now complains that the Order of this Court should be sealed from the public. However, Plaintiff provides no satisfactory justification for this highly unusual request.

Case law has been clear in providing that judicial proceedings are intended to be open to public scrutiny. As Judge Easterbrook of the Seventh Circuit noted in a 1992 opinion:

Judicial proceedings in the United States are open to the public—in criminal cases by constitutional command, and in civil cases by force of tradition. What happens in the halls of government is presumptively open to public scrutiny. Judges deliberate in private but issue public decisions after public arguments based on public records. . . . *Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat; this requires rigorous justification.*

*Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir.1992) (emphasis added) (citations omitted).

In support of his motion, the Plaintiff cites only one case, *In re Knight Publishing Co.*, 743 F.2d 231 (4th Cir.1984). That case *supports* publication of this Court's Order. First, the *Knight* case confirms the fundamental common law right of the public to have access to, inspect, and copy

judicial records.[21] Unlike the request here, which involves the Court's *decision* resolving this case, *Knight* involved a request, *in a criminal case,* for access to certain sealed *motion documents* which identified, among other things, the name of a confidential informant for the government; a complaint and arrest warrant that identified the informant; hearsay statements likely to prejudice defendants in pending criminal trials; and impertinent and scandalous material irrelevant to the issues in the trial. Other than this very sensitive or completely irrelevant information, all of the information involved in the *motion documents* in *Knight* was released. *Knight* did not involve any request to seal the Court's decision itself with respect to any of the subject documents.

At issue here are not documents underlying the Court's Order in this case. As noted above, there has been no request to seal the motions for summary judgment, the supporting memoranda, or the volumes of documents and affidavits presented in support thereof. To the contrary, the Plaintiff has moved to seal only the Court's Order itself.[22] Despite the opportunity to challenge or rebut the factual findings submitted by the Defendants that support the Court's Order, the Plaintiff remained silent ("Plaintiff respectfully declines specific comment"), choosing instead to present no argument stronger than a general claim that the proposed Order "is rife with unsubstantiated conclusory statements couched as 'fact,'" and a contention that "every relevant proposed finding of fact was contradicted by other relevant and more convincing evidence than that adduced in support of the Defendants' position."[23]

As the Plaintiff's own authority makes clear, there exists a presumption in favor of public access to court records. *Knight*, 743 F.2d at 235. This presumption has been recognized by other circuits as well.[24] The burden of demonstrating that justice requires the denial of access to court records falls squarely on the party "seeking to interfere with a fundamental common law right ...." *United States v. Edwards*, 672 F.2d 1289, 1294 (7th Cir.1982) (*citing Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)).

Plaintiff here has failed to overcome the strong presumption in favor of contemporaneous public access to the Court's Order. While the authorities require that a district court provide specific findings to support its decision to seal records, the Plaintiff has offered nothing to assist this Court in making such findings. Given the feeble effort the Plaintiff has made to justify such a radical move, the question Judge Easterbrook asked in *Krynicki* seems appropriate:

Have the litigants ... done more to justify the sealing of the briefs than the litigants in cases such as *Pentagon Papers*, where disclosure was said to threaten national security, and *The Progressive*, where disclosure was said to

---

21. *Knight*, 743 F.2d at 235.

22. It is difficult to imagine how sealing the Court's Order, in light of the pleadings already on file and available for public review in this case, will do anything to help the Plaintiff minimize the impact of his actions in bringing and losing this lawsuit. It is very much akin to shutting the proverbial barn door after the horse has long fled.

23. Letter from counsel for the Plaintiff to the Court dated October 20, 2000.

24. *See, e.g., In re Application of National Broadcasting Co. (United States v. Myers)*, 635 F.2d 945, 952 (2d Cir.1980) ("only the most compelling circumstances should prevent contemporaneous public access"); *In re Application of National Broadcasting Co. (United States v. Criden)*, 648 F.2d 814, 823 (3rd Cir. 1981) ("strong presumption that material introduced into evidence at trial should be made reasonably accessible in a manner suitable for copying and broader dissemination"); *United States v. Hubbard*, 650 F.2d 293, 317 (D.C.Cir.1980) ("important presumption in favor of public access"); *United States v. Edwards*, 672 F.2d 1289, 1294 (7th Cir.1982) ("[W]e hold that there is a strong presumption in support of the common law right to inspect and copy judicial records.").

threaten the survival of mankind? Not exactly.

*Krynicki,* 983 F.2d at 76.[25]

In *Krynicki,* Judge Easterbrook lamented the fact that the parties who requested the filing of sealed briefs did very little to present any justification for their requests. One of the matters involved a criminal case, the other a civil matter—a quarrel between wealthy siblings over an estate. In both cases Judge Easterbrook refused to seal the appellate briefs, stating with respect to the civil case that

> defendant omits any argument that might show why the information should be secret. That journalists are interested in the events underlying litigation is neither unusual nor deplorable. Judicial proceedings are not closed whenever the details are titillating, and open only when the facts are so boring that no one other than the parties cares about them.

*Id.* at 78.

The Plaintiff, a public figure, has failed to meet his burden of establishing any legitimate basis for which to seal this Court's Order from all public view, especially in light of the fact that all other pleadings and evidence in this case are available to the public. For all the foregoing reasons, the Plaintiff's Motion to Seal the Court's Order Pending Appeal is denied.

### III. *CONCLUSION*

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Seal Order Pending Appeal is DENIED.

IT IS SO ORDERED.

---

**25.** In asking this question, Judge Easterbrook was referring to requests made by the government to prevent publication of certain material by the press in the *Pentagon Papers* case, *New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and in *United States v. Progressive, Inc.,* 467 F.Supp. 990, rehearing denied, 486 F.Supp. 5 (W.D.Wis.), appeal dismissed, 610 F.2d 819 (7th Cir.1979).