UNITED STATES of America, Plaintiff,

v.

The PROGRESSIVE, INC., Erwin Knoll, Samuel Day, Jr., and Howard Morland, Defendants.

No. 79–C–98.

United States District Court, W. D. Wisconsin.

March 26, 1979.

Findings of Fact and Conclusions of Law March 28, 1979.

Frank M. Tuerkheimer, U. S. Atty., Western District of Wisconsin, Madison, Wis., Thomas S. Martin, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Earl Munson, Jr., LaFollette, Sinykin, Anderson & Munson, Madison, Wis., for all defendants except Morland.

Thomas P. Fox, Madison, Wis., for Morland.

## MEMORANDUM AND ORDER

WARREN, District Judge.

On March 9, 1979, this Court, at the request of the government, but after hearing from both parties, issued a temporary restraining order enjoining defendants, their employees, and agents from publishing or otherwise communicating or disclosing in any manner any restricted data contained in the article: "The H-Bomb Secret: How We Got It, Why We're Telling It."

In keeping with the Court's order that the temporary restraining order should be in effect for the shortest time possible, a preliminary injunction hearing was scheduled for one week later, on March 16, 1979.

At the request of the parties and with the Court's acquiescence, the preliminary injunction hearing was rescheduled for 10:00 A.M. today in order that both sides might have additional time to file affidavits and arguments. The Court continued the temporary restraining order until 5:00 P.M. today.

In order to grant a preliminary injunction, the Court must find that plaintiff has a reasonable likelihood of success on the merits, and that the plaintiff will suffer irreparable harm if the injunction does not issue. In addition, the Court must consider the interest of the public and the balance of the potential harm to plaintiff and defendants.

Jurisdiction in this action is grounded on 42 U.S.C. § 2280, the Atomic Energy Act and 28 U.S.C. § 1345.

Under the facts here alleged, the question before this Court involves a clash between allegedly vital security interests of the United States and the competing constitutional doctrine against prior restraint in publication.

In its argument and briefs, plaintiff relies on national security, as enunciated by Congress in The Atomic Energy Act of 1954, as the basis for classification of certain documents. Plaintiff contends that, in certain areas, national preservation and self-interest permit the retention and classification of government secrets. The government argues that its national security interest also permits it to impress classification and censorship upon information originating in the public domain, if when drawn together, synthesized and collated, such information acquires the character of presenting immediate, direct and irreparable harm to the interests of the United States.

Defendants argue that freedom of expression as embodied in the First Amendment is so central to the heart of liberty that prior restraint in any form becomes anathema. They contend that this is particularly true when a nation is not at war and where the prior restraint is based on surmise or conjecture. While acknowledg-

ing that freedom of the press is not absolute, they maintain that the publication of the projected article does not rise to the level of immediate, direct and irreparable harm which could justify incursion into First Amendment freedoms.

Hence, although embodying deep and fundamental principles of democratic philosophy, the issue also requires a factual determination by a federal court sitting in equity. At the level of a temporary restraining order, or a preliminary injunction, such matters are customarily dealt with through affidavits.

Thus far the affidavits filed are numerous and complex. They come from individuals of learning and renown. They deal with how the information at issue was assembled, what it means, and how injurious the affiant believes it to be.

The Court notes the *amici curiae* briefs filed by the American Civil Liberties Union, the Wisconsin Civil Liberties Union, the Federation of American Scientists and the Fund for Open Information and Accountability, Inc., and expresses thanks for them. The Court gave consideration to the suggestion that a panel of experts be appointed to serve as witnesses for the Court to assist it in determining whether the dangers of publication are as great as the government asserts or as inconsequential as *The Progressive* states. However, the Court concluded that such a procedure really would merely proliferate the opinions of experts arrayed on both sides of the issue.

Both parties have already marshalled impressive opinions covering all aspects of the case. The Court has read all this material and has now heard extensive argument. It is time for decision.

From the founding days of this nation, the rights to freedom of speech and of the press have held an honored place in our constitutional scheme. The establishment and nurturing of these rights is one of the true achievements of our form of government.

Because of the importance of these rights, any prior restraint on publication comes into court under a heavy presumption against its constitutional validity. *New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

However, First Amendment rights are not absolute. They are not boundless.

Justice Frankfurter dissenting in *Bridges v. California*, 314 U.S. 252, 282, 62 S.Ct. 190, 203, 86 L.Ed. 192 (1941), stated it in this fashion: "Free speech is not so absolute or irrational a conception as to imply paralysis of the means for effective protection of all the freedoms secured by the Bill of Rights." In the *Schenck* case, Justice Holmes recognized: "The character of every act depends upon the circumstances in which it is done." *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1931).

In *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), the Supreme Court specifically recognized an extremely narrow area, involving national security, in which interference with First Amendment rights might be tolerated and a prior restraint on publication might be appropriate. The Court stated:

"When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right." No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops. *Id.* at 716, 51 S.Ct. at 631 (citation omitted).

Thus, it is clear that few things, save grave national security concerns, are sufficient to override First Amendment interests. A court is well admonished to approach any requested prior restraint with a great deal of skepticism.

Juxtaposed against the right to freedom of expression is the government's contention that the national security of this country could be jeopardized by publication of the article.

The Court is convinced that the government has a right to classify certain sensitive documents to protect its national security. The problem is with the scope of the classification system.

Defendants contend that the projected article merely contains data already in the public domain and readily available to any diligent seeker. They say other nations already have the same information or the opportunity to obtain it. How then, they argue, can they be in violation of 42 U.S.C. §§ 2274(b) and 2280 which purport to authorize injunctive relief against one who would disclose restricted data "with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation . . . ."?

Although the government states that some of the information is in the public domain, it contends that much of the data is not, and that the Morland article contains a core of information that has never before been published.

Furthermore, the government's position is that whether or not specific information is "in the public domain" or has been "declassified" at some point is not determinative. The government states that a court must look at the nature and context of prior disclosures and analyze what the practical impact of the prior disclosures are as contrasted to that of the present revelation.

The government feels that the mere fact that the author, Howard Morland, could prepare an article explaining the technical processes of thermonuclear weapons does not mean that those processes are available to everyone. They lay heavy emphasis on the argument that the danger lies in the exposition of certain concepts never heretofore disclosed in conjunction with one another.

In an impressive affidavit, Dr. Hans A. Bethe, whose affidavit was introduced by the government and whose article, *The Hydrogen Bomb: II*, was a source document for Theodore Postol's affidavit I filed by the defendants states that sizeable portions of the Morland text should be classified as restricted data because the processes outlined in the manuscript describe the essential design and operation of thermonuclear weapons. He later concludes "that the design and operational concepts described in the manuscript are not expressed or revealed in the public literature nor do I believe they are known to scientists not associated with the government weapons programs."

The Court has grappled with this difficult problem and has read and studied the affidavits and other documents on file. After all this, the Court finds concepts within the article that it does not find in the public realm—concepts that are vital to the operation of the hydrogen bomb.

Even if some of the information is in the public domain, due recognition must be given to the human skills and expertise involved in writing this article. The author needed sufficient expertise to recognize relevant, as opposed to irrelevant, information and to assimilate the information obtained. The right questions had to be asked or the correct educated guesses had to be made.

The ability of G. I. Taylor to calculate the yield of the first nuclear explosion from a *Life* magazine photo demonstrates that certain individuals with some knowledge, ability to reason and extraordinary perseverance may acquire additional knowledge without access to classified information, even though the information thus acquired may not be obvious to others not so equipped or motivated. All of this must be considered in resolving the issues before the Court.

Does the article provide a "do-it yourself" guide for the hydrogen bomb? Probably not. A number of affidavits make quite clear that a *sine qua non* to thermonuclear capability is a large, sophisticated industrial capability coupled with a coterie of imaginative, resourceful scientists and technicians. One does not build a hydrogen bomb in the basement. However, the article could possibly provide sufficient information to allow a medium size nation to move faster in developing a hydrogen weapon. It could provide a ticket to by-pass blind alleys.

The Morland piece could accelerate the membership of a candidate nation in the thermonuclear club. Pursuit of blind alleys or failure to grasp seemingly basic concepts have been the cause of many inventive failures.

For example, in one of the articles submitted to the Court, the author described how, in the late 1930's, physicists in various countries were simultaneously, but independently, working on the idea of a nuclear chain reaction. The French physicists in their equation neglected to take full account of the fact that the neutrons produced by fission could go on to provoke further fissions in a many-step process— which is the essence of a chain reaction. Even though this idea seems so elementary, the concept of neutron multiplication was so novel that no nuclear physicists saw through the French team's oversight for about a year.

Thus, once basic concepts are learned, the remainder of the process may easily follow.

Although the defendants state that the information contained in the article is relatively easy to obtain, only five countries now have a hydrogen bomb. Yet the United States first successfully exploded the hydrogen bomb some twenty-six years ago.

The point has also been made that it is only a question of time before other countries will have the hydrogen bomb. That may be true. However, there are times in the course of human history when time itself may be very important. This time factor becomes critical when considering mass annihilation weaponry—witness the failure of Hitler to get his V-1 and V-2 bombs operational quickly enough to materially affect the outcome of World War II.

Defendants have stated that publication of the article will alert the people of this country to the false illusion of security created by the government's futile efforts at secrecy. They believe publication will provide the people with needed information to make informed decisions on an urgent issue of public concern.

However, this Court can find no plausible reason why the public needs to know the technical details about hydrogen bomb construction to carry on an informed debate on this issue. Furthermore, the Court believes that the defendants' position in favor of nuclear non-proliferation would be harmed, not aided, by the publication of this article.

The defendants have also relied on the decision in the New York Times case. In that case, the Supreme Court refused to enjoin the New York Times and the Washington Post from publishing the contents of a classified historical study of United States decision-making in Viet Nam, the so-called "Pentagon Papers."

This case is different in several important respects. In the first place, the study involved in the New York Times case contained historical data relating to events that occurred some three to twenty years previously. Secondly, the Supreme Court agreed with the lower court that no cogent reasons were advanced by the government as to why the article affected national security except that publication might cause some embarrassment to the United States.

A final and most vital difference between these two cases is the fact that a specific statute is involved here. Section 2274 of The Atomic Energy Act prohibits anyone from communicating, transmitting or disclosing any restricted data to any person "with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation."

Section 2014 of the Act defines restricted data. " 'Restricted Data' means all data concerning 1) design, manufacture, or utilization of atomic weapons; 2) the production of special nuclear material; or 3) the use of special nuclear material in the production of energy, but shall not include data declassified or removed from the Restricted Data category pursuant to section 2162 of this title."

As applied to this case, the Court finds that the statute in question is not vague or overbroad. The Court is convinced that the terms used in the statute—"communicates, transmits or discloses"—include publishing in a magazine.

The Court is of the opinion that the government has shown that the defendants had reason to believe that the data in the article, if published, would injure the United States or give an advantage to a foreign nation. Extensive reading and studying of the documents on file lead to the conclusion that not all the data is available in the public realm in the same fashion, if it is available at all.

What is involved here is information dealing with the most destructive weapon in the history of mankind, information of sufficient destructive potential to nullify the right to free speech and to endanger the right to life itself.

Stripped to its essence then, the question before the Court is a basic confrontation between the First Amendment right to freedom of the press and national security.

Our Founding Fathers believed, as we do, that one is born with certain inalienable rights which, as the Declaration of Independence intones, include the right to life, liberty and the pursuit of happiness. The Constitution, including the Bill of Rights, was enacted to make those rights operable in everyday life.

The Court believes that each of us is born seized of a panoply of basic rights, that we institute governments to secure these rights and that there is a hierarchy of values attached to these rights which is helpful in deciding the clash now before us.

Certain of these rights have an aspect of imperativeness or centrality that make them transcend other rights. Somehow it does not seem that the right to life and the right to not have soldiers quartered in your home can be of equal import in the grand scheme of things. While it may be true in the long-run, as Patrick Henry instructs us, that one would prefer death to life without liberty, nonetheless, in the short-run, one cannot enjoy freedom of speech, freedom to worship or freedom of the press unless one first enjoys the freedom to live.

Faced with a stark choice between upholding the right to continued life and the right to freedom of the press, most jurists would have no difficulty in opting for the chance to continue to breathe and function as they work to achieve perfect freedom of expression.

Is the choice here so stark? Only time can give us a definitive answer. But considering another aspect of this panoply of rights we all have is helpful in answering the question now before us. This aspect is the disparity of the risk involved.

The destruction of various human rights can come about in differing ways and at varying speeds. Freedom of the press can be obliterated overnight by some dictator's imposition of censorship or by the slow nibbling away at a free press through successive bits of repressive legislation enacted by a nation's lawmakers. Yet, even in the most drastic of such situations, it is always possible for a dictator to be overthrown, for a bad law to be repealed or for a judge's error to be subsequently rectified. Only when human life is at stake are such corrections impossible.

The case at bar is so difficult precisely because the consequences of error involve human life itself and on such an awesome scale.

The Secretary of State states that publication will increase thermonuclear proliferation and that this would "irreparably impair the national security of the United States." The Secretary of Defense says that dissemination of the Morland paper will mean a substantial increase in the risk of thermonuclear proliferation and lead to use or threats that would "adversely affect the national security of the United States."

Howard Morland asserts that "if the information in my article were not in the public domain, it should be put there . . so that ordinary citizens may have informed opinions about nuclear weapons."

Erwin Knoll, the editor of The Progressive, states he is "totally convinced that publication of the article will be of substantial benefit to the United States because it will demonstrate that this country's security does not lie in an oppressive and ineffective system of secrecy and classification but

in open, honest, and informed public debate about issues which the people must decide."

The Court is faced with the difficult task of weighing and resolving these divergent views.

A mistake in ruling against *The Progressive* will seriously infringe cherished First Amendment rights. If a preliminary injunction is issued, it will constitute the first instance of prior restraint against a publication in this fashion in the history of this country, to this Court's knowledge. Such notoriety is not to be sought. It will curtail defendants' First Amendment rights in a drastic and substantial fashion. It will infringe upon our right to know and to be informed as well.

A mistake in ruling against the United States could pave the way for thermonuclear annihilation for us all. In that event, our right to life is extinguished and the right to publish becomes moot.

In the *Near* case, the Supreme Court recognized that publication of troop movements in time of war would threaten national security and could therefore be restrained. Times have changed significantly since 1931 when *Near* was decided. Now war by foot soldiers has been replaced in large part by war by machines and bombs. No longer need there be any advance warning or any preparation time before a nuclear war could be commenced.

In light of these factors, this Court concludes that publication of the technical information on the hydrogen bomb contained in the article is analagous to publication of troop movements or locations in time of war and falls within the extremely narrow exception to the rule against prior restraint.

Because of this "disparity of risk," because the government has met its heavy burden of showing justification for the imposition of a prior restraint on publication of the objected-to technical portions of the Morland article, and because the Court is unconvinced that suppression of the objected-to technical portions of the Morland article would in any plausible fashion impede the defendants in their laudable crusade to stimulate public knowledge of nuclear armament and bring about enlightened debate on national policy questions, the Court finds that the objected-to portions of the article fall within the narrow area recognized by the Court in *Near v. Minnesota* in which a prior restraint on publication is appropriate.

The government has met its burden under section 2274 of The Atomic Energy Act. In the Court's opinion, it has also met the test enunciated by two Justices in the *New York Times* case, namely grave, direct, immediate and irreparable harm to the United States.

The Court has just determined that if necessary it will at this time assume the awesome responsibility of issuing a preliminary injunction against *The Progressive's* use of the Morland article in its current form.

However, the Court is acutely aware of the old legal adage that "bad cases make bad law." This case in its present posture will undoubtedly go to the Supreme Court because it does present so starkly the clash between freedom of press and national security. Does it go there with the blessing of the entire press? The Court thinks not. Many elements of the press see grave risk of permanent damage to First Amendment freedoms if this case goes forward. They feel appellate courts will find, as this Court has, that the risk is simply too great to permit publication.

Furthermore, if there is any one inescapable conclusion that one arrives at after wading through all these experts' affidavits, it is that many wise, intelligent, patriotic individuals can hold diametrically opposite opinions on the issues before us.

Recognizing that both sides at the moment may seem adamant, the Court nonetheless was greatly impressed by the arguments in the *amicus* brief submitted by the Federation of American Scientists through its director, Dr. Jeremy J. Stone.

This group, with half of America's Nobel laureates in its ranks, urged *The Progressive* to recognize the damage the article

could do to both nuclear non-proliferation policies and First Amendment rights. It sees the dangers of the present confrontation and suggests that similar cases can arise in the future involving this or other technologies. The group notes that it is possible for example, that a technology such as recombinant DNA could someday surface means of destruction that ought not be published while, at the same time, provoking crucial issues of public policy that badly need to be publicly discussed.

The group suggests that the accommodating of such conflicting interests is not best done in the glare of a judicial spotlight, but that the parties, seemingly at odds can, with effort, satisfy both their interests with a non-legal resolution.

The government seeks only the deletion of certain technical material and, in the Court's opinion, would have an interest in settling this case out of court. On the other hand, the Court believes that *The Progressive* has an obligation to its colleagues in the press and does not really require the objected-to material in order to ventilate its views on government secrecy and the hydrogen bomb.

In this context, the Federation urges that the Court give the parties every last chance to try to resolve the matter out-of-court, so as to simultaneously moot the case and set a desirable precedent for the future.

NOW THEREFORE, acting on this suggestion, the Court herewith poses to the parties a final choice:

We will now adjourn until 2:00 P.M. At that time the case will be recalled. In the interim, each party is to consider whether it would be willing to meet with a panel of five mediators appointed by the Court to attempt to resolve the parties' differences.

The Court recognizes that today is the deadline for the May issue of *The Progressive* and that the temporary restraining order expires at 5:00 P.M. this afternoon. If everyone is willing to attempt mediation, the temporary restraining order would have to be extended by mutual agreement.

If the parties agree to mediation, each side will be asked to submit to the Court the names of two senior weapons scientists and two representatives of the media. From these names the Court will select two people from each category and will then itself approach a respected lawyer or retired jurist and ask that person to chair the group. The given individuals would compose a mediating panel. This panel would have to receive appropriate clearance.

The panel would meet with the parties and report back to the Court in 10 days on its progress or lack of it, in dealing with the specific deletions at issue.

At the time of the report, the Court will then either dismiss the case by stipulation of the parties, or in the event of inability to agree, issue a preliminary injunction.

If, at 2:00 P.M. either or both sides are unable to agree to this proposal, the Court will regretfully issue the preliminary injunction.

SO ORDERED this 26th day of March, 1979, at Milwaukee, Wisconsin.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, having this day entered a preliminary injunction restraining defendants, *pendente lite*, from publishing or otherwise disseminating restricted data contained in the manuscript which is the subject of this action, hereby makes the following findings, of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

### FINDINGS OF FACT

1. The defendant Howard Morland is a free-lance writer specializing in energy and nuclear weapons issues. His article, "Tritium; the New Genie" appeared in the February, 1979, issue of *The Progressive* magazine.

2. Defendant, The Progressive, Inc., which publishes *The Progressive* magazine, has its principal place of business in Madison, Wisconsin.

3. Defendant Erwin Knoll is editor of *The Progressive* magazine.

4. Defendant Samuel H. Day, Jr., is the managing editor of *The Progressive* magazine.

5. While on assignment for *The Progressive* magazine, defendant Morland completed, at the end of February, an article describing the operation of a hydrogen bomb. The article was entitled, "The H-Bomb Secret—How We Got It, Why We're Telling It."

6. On February 27, 1979, a copy of the Morland article was delivered to the Department of Energy (DOE) offices in Germantown, Maryland. Defendant Day stated in a letter to the Department of Energy accompanying the article that the article contained technical information pertaining to hydrogen weapon design and manufacture. In this letter Mr. Day stated that he would appreciate the Department verifying the technical accuracy of the enclosures. Copies of this article were forwarded for review to John A. Griffin, Director of Classification of the Department of Energy and to Duane C. Sewell, Assistant Secretary of Energy for Defense Programs.

7. Based on their review of the article, Mr. Griffin and Mr. Sewell determined that a significant portion of the article contained information that the Atomic Energy Act, 42 U.S.C. § 2014(y), requires to be classified as Restricted Data. The Restricted Data contained in the article has not been declassified and remains classified as Secret Restricted Data.

8. On March 1, 1979, Lynn R. Coleman, General Counsel of the Department of Energy, telephoned *The Progressive* magazine and spoke with defendant Day and defendant Knoll. Mr. Coleman informed Mr. Day and Mr. Knoll that he was in possession of a copy of the Morland article, and that, in the opinion of the Department, the article contained Restricted Data, as defined in the Atomic Energy Act of 1954, as amended. He further informed Mr. Day and Mr. Knoll that, in the view of the Department of Energy, the Department of State and the Arms Control and Disarmament Agency, publication of the Restricted Data contained in this article would injure the United States and would give an advantage to other nations. He stated that the release of this information would be contrary to the United States' effort to prevent the proliferation of nuclear weapons and requested that *The Progressive* refrain from publishing the article.

9. On March 2, 1979, Duane Sewell met with representatives of *The Progressive*, including Mr. Day, Mr. Knoll, and Ronald Carbon, publisher. He advised them that the Department of Energy had reviewed the Morland manuscript and, based upon that review, had determined that it contains material which is Secret Restricted Data. He further told the magazine's representatives that publication of the article would constitute a violation of the Atomic Energy Act and would give an advantage to foreign nations in the development of thermonuclear technology. Mr. Sewell assured the magazine's representatives that the Department of Energy did not want to stop the publication of the entire manuscript but only those portions which contained Secret Restricted Data. He suggested to *The Progressive* that they permit the Government to work with them to recast the Secret Restricted Data portions of the manuscript so that they would no longer be classified and publication could go forward.

10. On March 7, 1979, Mr. Gordon Sinykin, counsel for *The Progressive*, advised Mr. Coleman of the Department of Energy that, after careful review of the matter, *The Progressive* intended to publish the article. He stated that publication would proceed unless the United States promptly obtained a temporary restraining order.

11. The complaint in this action was filed by the plaintiff, United States of America, in the United States District Court, Western District of Wisconsin, on March 8, 1979.

12. On March 9, 1979, the Honorable James E. Doyle, United States District Judge, Western District of Wisconsin, disqualified himself from this proceeding pur-

suant to 28 U.S.C. § 455(a). The case was subsequently transferred to the United States District Court for the Eastern District of Wisconsin.

13. On March 9, 1979, this Court held a hearing on the Government's request for a temporary restraining order to enjoin the defendants, their employees, and agents from publishing or otherwise disclosing in any manner any of the Restricted Data contained in the Morland article. After hearing from both parties, the Court issued a temporary restraining order to be in effect for the shortest time possible consistent with the opportunity for the Government to substantiate its claim at a hearing on the request for a preliminary injunction. A preliminary injunction hearing was scheduled for one week later, on March 16, 1979.

14. At the request of the parties, and with the Court's acquiescence, the preliminary injunction hearing was rescheduled from March 16, 1979, to March 26, 1979, in order that both sides might have additional time to file affidavits and briefs. The Court continued the temporary restraining order until 5:00 P.M. on Monday, March 26, 1979.

15. The Court has carefully read and studied the affidavits and other documents on file in this action and concludes that the article in question contains concepts that are not found in the public realm, concepts that are vital to the operation of the bomb. Although the Restricted Data portions of the article also contain some information that has been previously disclosed in scattered public sources, the article provides a more comprehensive, accurate, and detailed analysis of the overall construction and operation of a thermonuclear weapon than any publication to date in the public literature. Although various information in the public realm suggests a number of possible designs for a thermonuclear weapon, nowhere in the public domain is there a correct description of the type of design used in United States thermonuclear weapons.

16. Publication of the Restricted Data contained in the Morland article would be extremely important to a nation seeking a thermonuclear capability, for it would provide vital information on key concepts involved in the construction of a practical thermonuclear weapon. Once basic concepts are learned, the remainder of the process may easily follow. The article could provide sufficient information to allow a medium-size nation to move faster in developing a hydrogen weapon.

17. Publication of the Restricted Data contained in the article could materially reduce the time required by certain countries to achieve a thermonuclear weapon capability.

18. Defendants have reason to believe that publication, or any other disclosure of the Secret Restricted Data, would injure the United States or secure an advantage to a foreign nation, within the meaning of § 2274(b) of the Atomic Energy Act.

19. After careful review of the Morland article and other documents filed in this case, the Court finds that publication or other disclosure of the Secret Restricted Data contained in the Morland article would irreparably harm the national security of the United States.

20. The United States and its citizens will suffer irreparable harm and the public interest will be disserved if a preliminary injunction, *pendente lite*, is not issued. On balance, the defendants will not be substantially harmed by the issuance of such a preliminary injunction.

21. Publication of the Restricted Data in the Morland article will result in direct, immediate and irreparable damage to the United States by accelerating the capacity of certain non-thermonuclear nations to manufacture thermonuclear weapons.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 2280 and 28 U.S.C. § 1345.

2. Publication or other disclosure or communication of the Restricted Data contained in the Morland article would likely constitute a violation of the Atomic Energy Act, 42 U.S.C. § 2274(b).

**1000**

■ 3. The pertinent provisions of the Atomic Energy Act, 42 U.S.C. § 2274(b) and § 2280, apply to the defendants and are not constitutionally vague or over broad.

■ 4. Because defendants intend imminently to publish the Restricted Data contained in the Morland article, unless restrained by order of the court, plaintiff, United States of America, is entitled to a preliminary injunction, *pendente lite*, prohibiting publication or disclosure of the article pursuant to 42 U.S.C. § 2280.

5. In view of the showing of harm made by the United States, a preliminary injunction would be warranted even in the absence of statutory authorization because of the existence of the likelihood of direct, immediate and irreparable injury to our nation and its people. *New York Times Co. v. United States*, 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (Justice Stewart concurring); *see also, Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

6. The facts and circumstances as presented here fall within the extremely narrow recognized area, involving national security, in which a prior restraint on publication is appropriate. Issuance of a preliminary injunction does not, under the circumstances presented to the Court, violate defendants' First Amendment rights.

7. Plaintiff has proven all necessary prerequisites for issuance of a preliminary injunction restraining defendants from publishing or disclosing any Restricted Data contained in the Morland article until a final determination in this action has been made by the Court.

SO ORDERED this 28th day of March, 1979, at Milwaukee, Wisconsin.