113 Cal.Rptr.2d 338 (2001)
93 Cal.App.4th 648
DVD COPY CONTROL ASSOCIATION, Plaintiff and Respondent,
v.
Andrew BUNNER, Defendant and Appellant.
No. H021153.
Court of Appeal, Sixth District.
November 1, 2001.
Review Granted February 20, 2002.
*340 Weil, Gotshal & Manges, Jared Ben Bobrow, Christopher J. Cox, Sondra Roberto, Robert G. Sugarman, Jeffrey L. Kessler, New York City, Attorneys for Plaintiffs-Respondents.
Computer & Communications Industry Association, Edward J. Black, American Committee for Interoperable Systems, Howard M. Freedland, Williams & Connolly, Suzanne H. Woods, Washington, Dist. of Columbia, Counsel for Amicus Curiae on behalf of Plaintiffs-Respondents.
Huber & Samuelson, Allonn E. Levy, First Amendment Project, James Wheaton, Oakland, David Greene, Tomlinson Zisko Morosoli & Maser, Thomas E. Moore, Palo Alto, Electronic Frontier Foundation, Robin Dora Gross, Attorneys for Defendant-Appellant.
Howard, Rice, Nemerovski, Annette L. Hurst, San Francisco, Counsel for Amicus Curiae on behalf of Defendant Appellant.
*339 PREMO, Acting P.J.
This appeal arises from an action for injunctive relief brought under the Uniform Trade Secrets Act, Civil Code section 3426 et. seq. After learning that its trade secret had been revealed in DVD decryption software published on the Internet, plaintiff DVD Copy Control Association (DVDCCA) sought an injunction against defendant Andrew Bunner and numerous other Internet web-site operators to prevent future disclosure or use of the secret. The trial court granted a preliminary injunction, which required the defendants to refrain from republishing the program or any information derived from it. Bunner appeals from that order, contending that the First Amendment to the United States *341 Constitution protects his publication of the information as an exercise of free speech.[1]

FACTUAL BACKGROUND
A DVD is a thin disk five inches in diameter which can store a large amount of digital data. Each DVD can hold the data necessary to display a full-length motion picture. Motion pictures stored on DVDs are protected from unauthorized use by means of encryption using a "content scramble system" (CSS). CSS is designed to restrict the playback of an encrypted (scrambled) DVD to a CSS-equipped DVD player or DVD drive, which is capable of decrypting (unscrambling) the DVD. CSS is primarily composed of algorithms and 400 "master keys." Every CSS-encrypted DVD contains all 400 master keys, one of which is the trade secret at issue in this case.
DVDCCA, a trade association of businesses in the movie industry, controls the rights to CSS. DVDCCA licenses the CSS decryption technology to manufacturers of hardware and software for playing DVDs. Each licensee is assigned one or more master keys unique to that licensee.
In October 1999, a computer program entitled "DeCSS" was posted on the Internet allegedly by Jon Johansen, a 15 year old resident of Norway. DeCSS consists of computer source code[2] which describes a method for playing an encrypted DVD on a non-CSS-equipped DVD player or drive. Soon after its initial publication on the Internet, DeCSS appeared on numerous web sites throughout the world, including the web site of defendant Andrew Bunner. In addition, many individuals provided on their web sites "links" to copies of DeCSS on other web sites without republishing DeCSS themselves.

PROCEDURAL BACKGROUND

1. DVDCCA's Complaint for Injunctive Relief

On December 27, 1999, DVDCCA initiated an action under the Uniform Trade Secrets Act (UTSA or "Act") against Bunner and numerous other named and unnamed individuals who had allegedly republished or "linked" to DeCSS. DVDCCA alleged that DeCSS "embodies, uses, and/or is a substantial derivation of [DVDCCA's] confidential proprietary information." DVDCCA had protected this proprietary information by limiting its disclosure to those who had signed licensing agreements prohibiting disclosure to others. DVDCCA alleged that the proprietary information contained in DeCSS had been "obtained by willfully `hacking' and/or improperly reverse engineering" CSS software created by plaintiffs licensee Xing Technology Corporation (Xing). Xing had allegedly licensed its software to users exclusively under a license agreement that prohibited reverse engineering. According to DVDCCA, defendants "knew or should have known" that by posting DeCSS or providing "links" to the program, they were "misusing proprietary confidential information gained through improper means."
In the complaint DVDCCA sought an injunction to prevent any future disclosures of DeCSS.[3] The specific relief requested by DVDCCA was an order "restraining Defendants ... from making any further use or otherwise disclosing or *342 distributing ... or `linking' to other web sites which disclose, distribute or `link' to any proprietary property or trade secrets relating to the CSS technology and specifically enjoining Defendants ... from copying ... distributing, publishing ... or otherwise marketing the DeCSS computer program and all other products containing, using, and/or substantially derived from CSS proprietary property or trade secrets."
DVDCCA also requested a temporary restraining order (TRO). On December 27, 1999, DVDCCA sent to defendants by electronic mail a copy of the complaint and a notice of its application for a TRO. DVDCCA's attorney submitted a declaration stating that Bunner immediately responded by telephone and "indicated ... that he would take his web site down." On December 29, 1999, the trial court denied DVDCCA's request for a TRO but issued an order to show cause on DVDCCA's request for a preliminary injunction. A hearing was set for January 14, 2000. On January 12, 2000, one of DVDCCA's attorneys submitted a declaration in support of the request for a preliminary injunction in which he stated, "Defendants Bunner [and some of his co-defendants] ... appear to have removed DeCSS from its original location. It is not known whether these files were deleted or just posted elsewhere."

2. DVDCCA's Evidence and Arguments

DVDCCA submitted a declaration of its president, John Hoy. Hoy explained that DeCSS "embodies, uses, and/or is a substantial derivation of [DVDCCA's] confidential proprietary information." Hoy stated that he had tested DeCSS and determined that it contained a "master key" which DVDCCA had licensed to Xing. Hoy further asserted that "[t]o my knowledge," all of the end user licenses from DVDCCA's licensees prohibited reverse engineering. The agreement between DVDCCA and its CSS licensees prohibited those licensees from reverse-engineering CSS.
A former Xing employee declared that "Xing employed technical means to prevent the reading of its software program in clear text in order to deny unauthorized access to the underlying CSS keys and algorithms." Xing's "End-User License Agreement," which would appear on the screen during installation of Xing's software DVD player, stated that the "Product in source code form" was a "confidential" "trade secret" and the user "may not attempt to reverse engineer ... any portion of the Product." Thus, the user's assent to the agreement was obtained only through the installment process and was therefore a "click wrap" license agreement.
DVDCCA argued that it had a minimal evidentiary burden. DVDCCA suggested that it had no burden to show that [Johansen's conduct was] unlawful under Norwegian law; instead, it needed only to show that "improper means" under California law had been used. It argued that it could prevail even if it could not demonstrate that Johansen's conduct was unlawful or that defendants knew or had reason to know of the allegedly wrongful origin of DeCSS. It also asserted that "under California law, if a trade secret violation is established, irreparable harm is presumed" and "need not be shown."
DVDCCA conceded that "computer code is speech," but it argued it was entitled to a preliminary injunction because it had shown "a reasonable possibility" that it would prevail at trial and because the harm it would suffer would be "severe and irreparable." DVDCCA maintained that, even if defendants had not initially known that DeCSS contained a trade secret that had been acquired by improper means, they clearly were aware of that once *343 DVDCCA initiated the action and therefore were required to refrain from disclosing the trade secret.

3. Bunner's Evidence and Arguments

Bunner argued that injunctive relief would violate his First Amendment rights. He also asserted that there was no evidence that he knew or should have known that DeCSS had been created by improper use of any proprietary information.
Bunner asked the court to take judicial notice of a Norwegian law that permitted reverse engineering of computer software for the purpose of achieving "interoperability" and prohibited any agreement to the contrary. According to Bunner, Johansen had reverse-engineered Xing's software to create DeCSS so that CSS-encrypted DVDs could be played on computers that run under a computer operating system known as Linux. Even if Johansen had agreed not to reverse-engineer Xing's software, the Norwegian law invalidated that term of the license agreement. Hence, Johansen's reverse engineering was not "improper means" within the meaning of the UTSA.[4]
In support of his position Bunner submitted a declaration from an expert on Norwegian intellectual property law stating that no Norwegian criminal law or other legal precedent prohibited reverse engineering of computer software. DVDCCA, however, objected to Bunner's request for judicial notice of Norwegian law. Aided by the declaration of its own expert in Norwegian law, it maintained that reverse engineering of a decryption program was in fact unlawful in Norway.
Bunner also produced a declaration from Frank Stevenson, a computer programmer in Norway who was an expert in cryptography. Stevenson declared that the "master keys" on a CSS-encrypted DVD could be independently derived solely from a CSS-encrypted DVD itself without any unauthorized use of CSS decryption technology
In addition, Bunner submitted a declaration by David Wagner, a University of California cryptography researcher. Wagner believed that the publication of information about "flaws in supposedly secure systems serves a vital public interest" by notifying the public of these flaws. In Wagner's view, the DeCSS "high-level" source code "made it possible to analyze the security of the DVD security system without undertaking any tedious reverse engineering work."
Bunner also submitted a declaration by John Gilmore, an expert on computer security and encryption. Gilmore explained that widespread copying of DVDs was not currently feasible because the removable media commonly available today lacked the capacity for the "enormous file size" necessary to hold a complete movie.
Finally, Bunner submitted his own declaration. He admitted that he had become aware of DeCSS by "reading and participating in discussions held on a news web site entitled `slashdot.org.'" He stated that he had republished the DeCSS source code on his web site so that other programmers could modify and improve DeCSS and so that Linux users could use DeCSS to play DVDs. Bunner asserted that, at the time he republished DeCSS, he "had no information suggesting" that DeCSS "contained any trade secrets" or "involved any misappropriation of trade secrets," and he confirmed *344 to believe that DeCSS had been either "properly reverse engineered or independently created without [the] appropriation of any trade secrets." Consequently, Bunner maintained that there was no evidence that he had reason to know that Johansen had used "improper means" to obtain the trade secret that had allegedly been incorporated into DeCSS.
Bunner objected to DVDCCA's failure to define precisely what it was that had been "substantially derived from proprietary information property or trade secrets of the CSS." He also asserted that the disclosure of the alleged trade secret throughout the world over the Internet had caused it to "become a matter of public knowledge" which had lost any trade secret status.

4. The Trial Court's Order

The trial court heard DVDCCA's request for a preliminary injunction on January 17, 2000. No evidence was introduced at the hearing. Instead, the matter was submitted on the written declarations and the arguments of the parties.
On January 21, 2000, the trial court issued a preliminary injunction. The order enjoined defendants from "[p]osting or otherwise disclosing or distributing, on their web sites or elsewhere, the DeCSS program, the master keys or algorithms of the Content Scrambling system (`CSS'), or any other information derived from this proprietary information." The court expressly refused to enjoin the defendants from linking to other web sites that contained protected information, because the links were indispensable to Internet access and a web-site owner could not be held responsible for the content of other web sites. The court further stated that "[n]othing in this Order shall prohibit discussion, comment or criticism, so long as the proprietary information identified above is not disclosed or distributed."
In reaching its decision the court made the following findings. First, DVDCCA had established that CSS was its trade secret, and DVDCCA had exerted reasonable efforts to maintain the secrecy of the program. Second, the evidence was "fairly clear that the trade secret was obtained through reverse engineering." The trial court acknowledged that the UTSA recognized reverse engineering as "proper means." Thus, "[t]he only way in which the reverse engineering would be considered `improper means' herein would be if whoever did the reverse engineering was subject to the click licence [sic] agreement which preconditioned installation of DVD software or hardware, and prohibited reverse engineering."
On this point the court observed that "[p]laintiff's case is problematic at this prediscovery stage. Clearly they have no direct evidence at this point that Mr. Jon Johansen did the reverse engineering, and that he did so after clicking on any licence [sic] agreement." Nevertheless, the court concluded that "[t]he circumstantial evidence, available mostly due to the various defendants' inclination to boast about their disrespect for the law, is quite compelling on both the issue of Mr. Johansen's improper means [and] th[e] Defendants' knowledge of impropriety."[5]
The trial court declined to decide whether Norwegian law prohibited Johansen's alleged reverse engineering. "This Court is not well positioned to interpret Norwegian Law, and Defendant's own expert, even if this Court could consider expert *345 testimony on a question of legal interpretation, states that the issue has not been conclusively decided in Norway. Defendants have not sufficiently supported their argument that the licence [sic] agreement, like the one at issue here, would be disallowed by Norwegian Law, although they may at some point be able to do so."
The court further determined that the balance of hardships favored DVDCCA. "Most compelling in this matter is the relative harm to the parties. At this point in the proceeding, the harm to the Defendants is truly minimal. They will simply have to remove the trade secret information from their web sites. They may still continue to discuss and debate the subject as they have in the past in both [sic] an educational, scientific, philosophical and political context. Defendants have not provided evidence of any economic harm which an injunction could currently cause, although if such an injunction were not granted it is quite possible that this could change which could potentially shift the burden of harm in Defendants' favor. [¶] On the other hand, the current and prospective harm to the Plaintiff, if the Court does not enjoin the display of their trade secret, will be irreparable."
The trial court recognized that continued exposure of DVDCCA's trade secret on the Internet would result in the loss of the secret, but it was not convinced that the posting that had already occurred had destroyed the secret. The court acknowledged the "many potential enforcement problems," but it concluded that these problems did not preclude relief so long as DVDCCA was otherwise entitled to relief.

DISCUSSION

1. Standard of Review

Preliminary injunctions are ordinarily reviewed under the deferential abuse-of-discretion standard. We consider only whether the trial court abused its discretion in evaluating two interrelated factors. "`"The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction [is] denied as compared [with] the harm the defendant is likely to suffer if the preliminary injunction [is] issued."'" (People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1109, 60 Cal.Rptr.2d 277, 929 P.2d 596.)
However, not all restraining preliminary injunctions are entitled to such deferential review.[6] "[A]ny prior restraint on expression bears a heavy presumption against its constitutional validity." (Wilson v. Superior Court (1975) 13 Cal.3d 652, *346 657,119 Cal.Rptr. 468, 532 P.2d 116, italics added.) "[T]he reviewing court in free speech cases must make an independent examination of the whole record." (L.A. Teachers Union v. L.A. City Bd. of Ed. (1969) 71 Cal.2d 551, 557, 78 Cal.Rptr. 723, 455 P.2d 827, italics added.) "[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to `make an independent examination of the whole record' in order to make sure that `the judgment does not constitute a forbidden intrusion on the field of free expression.'" (Bose Corp. v. Consumers Union of U.S., Inc. (1984) 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502.)
Thus, in order to determine the appropriate standard of review, we must first decide whether the restraint imposed by the trial court's preliminary injunction implicated Bunner's First Amendment right to free expression. If so, we exercise independent review.

2. The Uniform Trade Secrets Act

California has enacted a version of the UTSA that is designed to protect economically valuable trade secrets from misappropriation. (Civ.Code, § 3426.1 et. seq.) Under this statute, a trade secret is misappropriated if a person (1) acquires a trade secret knowing or having reason to know that the trade secret has been acquired by "improper means," (2) discloses or uses a trade secret the person has acquired by "improper means" or in violation of a nondisclosure obligation, (3) discloses or uses a trade secret the person knew or should have known was derived from another who had acquired it by improper means or who had a nondisclosure obligation or (4) discloses or uses a trade secret after learning that it is a trade secret but before a material change of position. (Civ.Code, § 3426.1, subd. (b).)
"Improper means" is defined by the Act to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." (Civ. Code, § 3426.1 subd. (a).) The Act expressly states that "[r]everse engineering or independent derivation alone shall not be considered improper means." (Civ. Code, § 3426.1, subd. (a).) The Act allows for injunctive relief against "[a]ctual or threatened misappropriation" of a trade secret. (Civ.Code, § 3426.2.)
Computer software can constitute a trade secret. "[C]omputer software can qualify for trade secret protection under the UTSA. [Citation.] However, a plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." (MAI Systems Corp. v. Peak Computer, Inc. (9th Cir. 1993) 991 F.2d 511, 522.)
DVDCCA argues that "this case is (and always has been) about theft of intellectual property." Yet DVDCCA's complaint did not allege that Bunner was involved in any "theft" or other improper acquisition of intellectual property. Instead, DVDCCA alleged that Bunner's republication of DeCSS violated the Act because (1) DeCSS disclosed one of DVDCCA's trade secret "master keys," (2) the master key had been obtained by improper means, and (3) Bunner had reason to know both that DeCSS contained the master key and that the master key had been obtained by improper means. Thus, while Bunner did not use improper means to acquire DVDCCA's proprietary information, he disclosed DeCSS when he knew or should have known that DeCSS had been "created through the unauthorized use of proprietary CSS information, which was illegally `hacked.'" The allegation that Bunner had actual or constructive knowledge that *347 DeCSS had been created by improper means was premised on Bunner's alleged knowledge of postings on the Internet which indicated that DeCSS was illicit.
We will assume for purposes of our discussion that the trial court correctly concluded that DVDCCA had established a "reasonable probability" that it could prove these allegations and had shown that the relative burden of harms favored issuance of injunctive relief. While the trial court's conclusions, if correct, would justify preliminary injunctive relief in the absence of any free-speech concerns, we must first consider whether the order can withstand scrutiny under the First Amendment.

3. Applicability of the First Amendment

Bunner contends that the injunction violates his First Amendment rights because it constitutes a prior restraint on his freedom of speech. DVDCCA responds that Bunner had no First Amendment right to disclose a trade secret in violation of the UTSA.
The first question we consider is whether DeCSS is "speech" that is within the scope of the First Amendment. The application of the First Amendment does not depend on whether the publication occurred on the Internet or by traditional means. (Reno v. American Civil Liberties Union (1997) 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874.) Likewise, it makes no difference that Bunner is a republisher rather than the original author of DeCSS. "It would be anomalous if the mere fact of publication and distribution were somehow deemed to constitute `conduct' which in turn destroyed the right to freely publish." (Wilson v. Superior Court, supra, 13 Cal.3d at p. 660, 119 Cal.Rptr. 468, 532 P.2d 116.) "[A] naked prohibition against disclosures is fairly characterized as a regulation of pure speech." (Bartnicki v. Vopper (2001) 532 U.S. 514, 526, 121 S.Ct. 1753, 1761, 149 L.Ed.2d 787 (Bartnicki).)[7] Nor does it matter that the disclosure was made by an individual on his web site rather than a media publication in a newspaper. The right to freedom of speech "does not restrict itself `depending] upon the identity' or legal character of the speaker, `whether corporation, association, union, or individual.' " (Gerawan Farming, Inc. v. Lyons (2000) 24 Cal.4th 468, 485, 101 Cal.Rptr.2d 470, 12 P.3d 720; Bartnicki v. Vopper, supra, 532 U.S. at p. 526 [121 S.Ct. at p. 1760], fn. 8.)
DVDCCA has not alleged that Bunner engaged in any expressive "conduct" by posting DeCSS on his web site. Nor is there any indication in the record that Bunner engaged in conduct mixed with speech. DVDCCA does suggest, however, that DeCSS is insufficiently expressive because it is composed of source code and has a functional aspect. "The issue of whether or not the First Amendment protects encryption source code is a difficult one because source code has both an expressive feature and a functional feature. The United States does not dispute that it *348 is possible to use encryption source code to represent and convey information and ideas about cryptography and that encryption source code can be used by programmers and scholars for such informational purposes. Much like a mathematical or scientific formula, one can describe the function and design of encryption software by a prose explanation; however, for individuals fluent in a computer programming language, source code is the most efficient and precise means by which to communicate ideas about cryptography. [¶] ... The fact that a medium of expression has a functional capacity should not preclude constitutional protection. [¶] ... [¶] ... [C]omputer source code, though unintelligible to many, is the preferred method of communication among computer programmers. [¶] Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment." (Junger v. Daley (6th Cir.2000) 209 F.3d 481, 484-485.)
Like the CSS decryption software, DeCSS is a writing composed of computer source code which describes an alternative method of decrypting CSS-encrypted DVDs. Regardless of who authored the program, DeCSS is a written expression of the author's ideas and information about decryption of DVDs without CSS. If the source code were "compiled" to create object code, we would agree that the resulting composition of zeroes and ones would not convey ideas. (See generally Junger v. Daley, supra, 209 F.3d at pp. 482-483.) That the source code is capable of such compilation, however, does not destroy the expressive nature of the source code itself. Thus, we conclude that the trial court's preliminary injunction barring Bunner from disclosing DeCSS can fairly be characterized as a prohibition of "pure" speech.

4. Protection of Source Code Containing a Trade Secret

The First Amendment protects a "wide range of expression" from pure entertainment to political speech. (Schad v. Mount Ephraim (1981) 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671.) "All ideas having even the slightest redeeming social importanceunorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinionhave the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests."[8] (Roth v. United States (1957) 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498.)
The parties recognize that First Amendment protection is not without limits. Obscenity, libel, and "fighting words" have long been recognized as falling outside the scope of the First Amendment because they lack any social value. (Roth v. United States, supra, 354 U.S. at pp. 484-485, 77 S.Ct. 1304.) "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' words ... It has been well observed that such utterances are no essential part of any exposition of *349 ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Chaplinsky v. New Hampshire (1942) 315 U.S. 568, 571-572, 62 S.Ct. 766, 86 L.Ed. 1031, fns. omitted.)
DeCSS does not fall into any of these established exceptions: it is not lewd, profane, obscene, or libelous, nor did it involve any fighting words. DVDCCA does not ask this court to create a new judicial exception for software containing a misappropriated trade secret, and we decline to do so here. Although the social value of DeCSS may be questionable, it is nonetheless pure speech.
DVDCCA maintains, however, that courts "routinely enjoin trade secret misappropriation," even over a First Amendment defense. The cases on which it relies, however, are not comparable to the situation presented here, as they involved the actual use of a secret or the breach of a contractual obligation. In both Courtesy Temporary Service, Inc. v. Camacho (1990) 222 Cal.App.3d 1278, 1291, 272 Cal.Rptr. 352 and American Credit Indemnity Co. v. Sacks (1989) 213 Cal.App.3d 622, 638, 262 Cal.Rptr. 92, for example, the orders enjoined the use of confidential information to solicit customers. In Garth v. Staktek Corp. (Tex.App. 1994) 876 S.W.2d 545 the injunction was necessary to preclude the improper sale and use of trade secret technology. And in Cherne Indus., Inc. v. Grounds & Associates (Minn.1979) 278 N.W.2d 81 the defendants were enjoined from using confidential customer information obtained from their former employer in violation of their contractual duty not to use or disclose the information or take it with them when they left the company. The enforcement of a contractual nondisclosure obligation does not offend the First Amendment. A voluntary agreement not to disclose a trade secret ordinarily waives any First Amendment protection for an ensuing disclosure.
California's Trade Secrets Act, like the laws enacted in many other states to protect trade secrets, does not merely enhance the enforcement of contractual nondisclosure obligations but sweeps far more broadly. It is within this broad sweep that DVDCCA seeks to place Bunner. Yet the scope of protection for trade secrets does not override the protection offered by the First Amendment. The First Amendment prohibits the enactment of any law "abridging the freedom of speech...." The California Legislature is free to enact laws to protect trade secrets, but these provisions must bow to the protections offered by the First Amendment. None of the trade secret cases cited by DVDCCA holds to the contrary.
DVDCCA also relies heavily on cases that upheld injunctions in copyright infringement cases. Protections for trade secrets, however, are not comparable to protections for copyrights with respect to the First Amendment. First, since both the First Amendment and the constitutional authority underlying the Copyright Act are contained in the United States Constitution, the resolution of a conflict between free speech and copyright involves a delicate balancing of two federal constitutional protections. Article I of the United States Constitution explicitly grants Congress the power "To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." (U.S. Const., art. I, § 8, cl. 8.) The UTSA, on the other hand, lacks any constitutional foundation. Consequently, a clash between the trade secrets law and the First Amendment does not involve *350 a balancing between two constitutional interests.
Second, injunctions in copyright infringement cases have been upheld "on the ground that First Amendment concerns are protected by and coextensive with the [Copyright Act's] fair use doctrine." (Nihon Keizai Shimbun, Inc. v. Comline Business Data (2nd Cir.1999) 166 F.3d 65, 74.) The "fair use" exception permits copying and use of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research" under certain circumstances. (17 U.S.C., § 107.) It "offers a means of balancing the exclusive rights of a copyright holder with the public's interest in dissemination of information affecting areas of universal concern, such as art, science and industry. Put more graphically, the doctrine distinguishes between `a true scholar and a chiseler who infringes a work for personal profit.'" (Wainwright Sec. v. Wall Street Transcript Corp. (1977) 558 F.2d 91, 94.) In contrast, the UTSA contains no exception for "fair use" or any other vehicle for safeguarding First Amendment concerns. The Act prohibits even speech that is scholarly, addresses legitimate concerns, and seeks no profit for the speaker, while the Copyright Act's fair-use doctrine would permit copyright infringement in those circumstances. Consequently, one of the primary justifications for issuing injunctions in these copyright infringement cases is not present in trade secret cases.
Third, the statutory prohibition on disclosures of trade secrets is of infinite duration rather than "for limited Times." While the limited period of copyright protection authorized by the United States Constitution ensures that copyrighted material will eventually pass into the public domain, thereby serving the public interest by increasing its availability to the general public, the UTSA bars disclosure of a trade secret for a potentially infinite period of time, thereby ensuring that the trade secret will never be disclosed to the general public.
Thus, the availability of injunctive relief against copyright infringement is supported by justifications that are inapplicable to trade secrets. Both the First Amendment and the Copyright Act are rooted in the United States Constitution, but the UTSA lacks any constitutional basis. The prohibition on disclosure of a trade secret is of infinite duration while the copyright protection is strictly limited in time, and there is no "fair use" exception as there is for copyrighted material. These significant distinctions between copyright and trade secret protections explain why courts have concluded that the First Amendment is not a barrier to injunctive relief in copyright infringement cases.
We must conclude that Bunner's republication of DeCSS was "pure speech" within the ambit of the First Amendment. It is therefore necessary for us to apply independent review to the trial court's issuance of a preliminary injunction.

5. Prior Restraint

The trial court's prohibition of future disclosures of DeCSS was a prior restraint on Bunner's First Amendment right to publish the DeCSS program. A prior restraint is generally defined as an administrative or judicial order "`forbidding certain communications when issued in advance of the time that such communications are to occur.'" (Alexander v. United States (1993) 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441, italics omitted.) The "special vice" of a prior restraint is that it suppresses expression not only directly, but also by "inducing excessive caution in the speaker." (Pittsburgh *351 Press Co. v. Human Rel. Comm'n (1973) 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669.)
Prior restraints on pure speech are highly disfavored and presumptively unconstitutional. (Hurvitz v. Hoefflin (2000) 84 Cal.App.4th 1232, 1241, 101 Cal. Rptr.2d 558.) "In the case of a prior restraint on pure speech, the hurdle is substantially higher [than for an ordinary preliminary injunction]: publication must threaten an interest more fundamental than the First Amendment itself. Indeed, the Supreme Court has never upheld a prior restraint, even faced with the competing interest of national security or the Sixth Amendment right to a fair trial." (Procter & Gamble Co. v. Bankers Trust Co. (6th Cir.1996) 78 F.3d 219, 226-227; cf. Nebraska Press Assn. v. Stuart (1976) 427 U.S. 539, 563, 96 S.Ct. 2791, 49 L.Ed.2d 683 [the Sixth Amendment right of a criminal defendant to a fair trial does not outrank the First Amendment right of the press to publish information]; New York Times Co. v. United States (1971) 403 U.S. 713, 718-726, 91 S.Ct. 2140, 29 L.Ed.2d 822 ["national security" interest in suppressing classified information in the Pentagon Papers did not outrank First Amendment right of press to publish classified information].) "[I]t is clear that few things, save grave national security concerns, are sufficient to override First Amendment interests." (United States v. Progressive, Inc. (1979) 467 F.Supp. 990, 992 [court issued prior restraint on publication of technical information about hydrogen bomb only because it found that such information was analogous to information about troop movements which posed a grave threat to national security].) "If a threat to national security was insufficient to warrant a prior restraint in New York Times Co. v. United States, the threat to plaintiffs copyrights and trade secrets is woefully inadequate." (Religious Technology Center v. Lerma (E.D.Va.1995) 897 F.Supp. 260, 263.)
DVDCCA's statutory right to protect its economically valuable trade secret is not an interest that is "more fundamental" than the First Amendment right to freedom of speech or even on equal footing with the national security interests and other vital governmental interests that have previously been found insufficient to justify a prior restraint. Our respect for the Legislature and its enactment of the UTSA cannot displace our duty to safeguard the rights guaranteed by the First Amendment. Accordingly, we are compelled to reverse the preliminary injunction.
We express no opinion as to whether permanent injunctive relief may be obtained after a full trial on the complaint, as that issue is not before us.[9] We further have no occasion to decide whether damages for Bunner's disclosure would be appropriate in these circumstances. DVDCCA may, of course, bring an action for damages or even injunctive relief against anyone who violates the Act by conduct rather than speech. In addition, a person who exposes the trade secret may be liable for damages if he or she was bound by a contractual obligation to safeguard the secret. And anyone who infringes *352 a copyright held by DVDCCA or by any DVD content provider may be subject to an action under the Copyright Act. We hold only that a preliminary injunction cannot be used to restrict Bunner from disclosing DeCSS.

DISPOSITION
The order granting a preliminary injunction is reversed. Defendant Andrew Bunner shall recover his appellate costs.
WE CONCUR: ELLA, J., and MIHARA, J.
NOTES
[1] Although there were numerous defendants below, only Bunner has appealed.
[2] "Source code" is the language in which computer programmers write their computer programs.
[3] DVDCCA's action sought solely injunctive relief and did not allege any cause of action for damages.
[4] Civil Code section 3426.1 of the Act defines "improper means" of acquiring a trade secret to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone shall not be considered improper means."
[5] There was no evidence that Bunner himself had ever contributed any of these writings indicating disrespect for the law.
[6] The trial court's preliminary injunction purported in part to be more than a restraining injunction. It stated that defendants "will simply have to remove the trade secret information from their web sites." Removal of information from a web site would appear to be an affirmative act which would change the status quo. "Where, as here, the preliminary injunction mandates an affirmative act that changes the status quo, we scrutinize it even more closely for abuse of discretion. `The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts. A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal.' (Board of Supervisors v. McMahon (1990) 219 Cal.App.3d 286, 295, 268 Cal.Rptr. 219, fn. omitted [preliminary injunction ordering state to pay AFDC (Aid to Families with Dependent Children) ]; Shoemaker v. County of Los Angeles (1995) 37 Cal.App.4th 618, 625, 43 Cal. Rptr.2d 774 [preliminary injunction ordering reinstatement of employee to administrative posts from which he had been removed].)

Since the record before us reflects that Bunner had already removed DeCSS from his web site and neither party argues that the trial court's injunction was a mandatory injunction, it is appropriate to view the trial court's order, at least as to Bunner, as simply a restraining injunction.
[7] Both parties have submitted supplemental briefs addressing Bartnicki. In this recent case the United States Supreme Court considered the extent to which the First Amendment protected a third-party publisher who was constructively aware that the published information had been unlawfully obtained. The United States Supreme Court ruled that the First Amendment precluded imposition of post-publication damages on the third party. (532 U.S. at pp. 518-526, 121 S.Ct. at pp. 1756-1760.) Bartnicki did not involve the disclosure of trade secret information, and the court expressly declined to consider whether the same result would have been reached in such a case. (532 U.S. at p. 532, 121 S.Ct. at p. 1764.) Bartnicki also did not involve a prior restraint. The parties agree that the plurality opinion in Bartnicki does not resolve the issues before us in this case.
[8] Even "commercial speech" is entitled to some level of First Amendment protection though less than "noncommercial speech." (Gerawan Fanning, Inc. v. Lyons, supra, 24 Cal.4th at pp. 485-486, 101 Cal.Rptr.2d 470, 12 P.3d 720.) Commercial speech is, at its "core," speech that proposes a commercial transaction, and it may extend also to speech `related solely to the economic interests of the speaker and its audience.'" (Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 422, 113 S.Ct. 1505, 123 L.Ed.2d 99.)
[9] Whether a permanent injunction may constitute a prior restraint is unclear. (Compare Alexander v. United States, supra, [prior restraint encompasses permanent as well as preliminary injunctions] with Pittsburgh Press Co. v. Human Rel. Comm'n, supra, 413 U.S. at p. 390, 93 S.Ct. 2553 [prior restraints suppress speech "before an adequate determination that it is unprotected by the First Amendment"]; see also Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 138, 87 Cal.Rptr.2d 132, 980 P.2d 846 (lead opn of George, C.J.) [injunction after judicial finding of employment discrimination is not an invalid prior restraint, but only precludes continuation of unlawful activity].)